**Dean B. SMITH and Irma Smith, Petitioners–Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.**

**No. 90–1007.**

United States Court of Appeals, Sixth Circuit.

Argued Oct. 9, 1990.

Decided June 27, 1991.

Dennis N. Brager (argued), Jackson D. Hamilton, Spensley, Horn, Jubas & Lubitz, Los Angeles, Cal., for petitioners-appellants.

Peter K. Scott, I.R.S., Office of Chief Counsel, Gary R. Allen, Acting Chief, Mary F. Clark, David I. Pincus (argued), Kenneth W. Rosenberg, U.S. Dept. of Justice, Appellate Section Tax Div., Washington, D.C., for respondent-appellee.

Before NELSON, Circuit Judge, WELLFORD *, Senior Circuit Judge, and JOINER **, Senior District Judge.

WELLFORD, Senior Circuit Judge.

Appellants, Dean B. Smith and Irma Smith, appeal from the decision of the United States Tax Court concerning deficiencies and penalties imposed upon their federal income tax for 1981 and 1982 by the Commissioner of Internal Revenue. The Tax Court determined that the 1981 and 1982 deficiencies constituted substantial under-

payments attributed to a tax-motivated transaction under I.R.C. § 6621 and that petitioners were liable for an additional assessment (in addition to § 6661). *Smith v. Commissioner*, 91 T.C. 733 (1988). On this appeal, we must decide: (1) whether the Tax Court correctly determined the taxpayers were not entitled to deduct their allocable shares of partnership losses from the Koppelman Process activities; and (2) whether the Tax Court correctly sustained an addition to petitioners' tax under I.R.C. § 6661 for a substantial understatement of tax and imposed additional interest under § 6621(c) for substantial underpayments attributable to tax-motivated transactions.

The Tax Court decided that appellants were not entitled to deduct a pro rata share of the losses incurred by Syn–Field Associates, Ltd. (SFA).[1] The Tax Court determined that the taxpayers were not liable for an addition to tax pursuant to § 6659. In 1989, the Tax Court issued a supplemental opinion concerning the calculation of the amount of the underpayment subject to the addition to tax under I.R.C. § 6661. We have jurisdiction to hear this appeal under 26 U.S.C. § 7482.

In 1981, the Smiths became limited partners in SFA. In 1981, James Karr became a limited partner in Peat Oil and Gas Associates, Ltd. (POGA). SFA and POGA (collectively the "partnerships") were formed for the purpose of (1) engaging in the exploration and development of oil and gas prospects and the acquisition and ownership of gas and oil interests; (2) owning, licensing or otherwise exploiting technology relating to the production of synthetic fuel (K–Fuel) (K–Fuel is a high heating value solid fuel, physically resembling coal, produced by placing wood, peat, lignite and other low grade fossil fuel into a Koppelman Reactor at temperatures and pressures) from peat and other materials; and

* The Honorable Harry W. Wellford assumed senior status on January 21, 1991.
** The Honorable Charles W. Joiner, Senior United States District Judge for the Eastern District of Michigan, sitting by designation.

1. The Tax Court consolidated this case with a related case in which an appeal was taken to the United States Court of Appeals for the Eleventh Circuit; that court recently affirmed the Tax Court's decision. *Karr v. Commissioner*, 924 F.2d 1018 (11th Cir.1991). The Tax Court's opinion refers to both the Smiths and the Karrs, the latter being Georgia residents.

(3) experimenting with, using, and licensing technology to try to demonstrate the commercial feasibility of producing synthetic fuel from peat and other cellulosic materials. The idea included the construction, operation, and management of a pilot plant that would attempt to convert peat and other cellulosic material into synthetic fuel for marketing purposes. We set out facts that are found essentially undisputed by the Tax Court. The partnerships entered into a joint venture agreement to own, operate, and manage a North Carolina pilot K–Fuel plant. This is known as the "Koppelman process."

The Koppelman process, reviewed and extensively written about in various technical and industry journals, was developed by Edward Koppelman. In 1980, the United States Department of Energy awarded Koppelman a substantial grant to study the feasibility of his process. Pursuant to this grant, Koppelman, SRI International (SRI), the University of Maine, a large investment banker, and others, including Ekono, Inc. and Central Maine Power Company, a utility and a large engineering firm, prepared a report concluding that the Koppelman process was "technically, environmentally, and economically feasible." 91 T.C. at 735. SRI is a research and development organization that provides research and consulting for business and government clients worldwide.

In the summer of 1981, Koppelman, together with SRI, completed a model plant capable of producing K–Fuel in small quantities. At the end of 1981, it was believed that the chances of completing successful construction of a K–Fuel plant were high.

In August 1981, Ronodo Corporation, N.V. (Ronodo) sublicensed from Koppelman the exclusive right to use the Koppelman process within the State of North Carolina to refine and convert peat and wood into K–Fuel. Koppelman also granted Ronodo certain additional rights, all of which were sublicensed by Ronodo to its wholly owned subsidiary Sci–Teck Licensing Corp. (Sci–Teck).

At the end of 1981, the partnerships involving Smith and Karr licensed from Sci–Teck the exclusive rights within the State of North Carolina to use the Koppelman process with respect to peat and wood, as well as the nonexclusive rights to use the Koppelman process in the remainder of the United States with respect to any material other than bagasse. The partnerships agreed to pay a license fee to Sci–Teck including payment by both cash and notes.

The partnerships also entered into research and development agreements with Fuel–Tech Research and Development (FTRD), which was to conduct and coordinate the research and development efforts of Koppelman, A.T. Kearney, and others, and to oversee the construction by Stone & Webster of a Koppelman process plant. The partnerships agreed to pay FTRD a fee for its services, again through cash and partnership notes. By 1984, a Koppelman process plant had been built in North Carolina.

Taxpayers purchased their one unit partnership interest for $161,500, pursuant to the following schedule of principal amounts:

$10,000 payable upon subscription to SFA

  10,000 due Mar. 1, 1982
  10,000 due Mar. 1, 1983
   7,500 due Mar. 1, 1984
  24,000 due Mar. 1, 1993
  30,000 due Mar. 1, 1994
  30,000 due Mar. 1, 1995
  30,000 due Mar. 1, 1996
  10,000 due Mar. 1, 2007

Taxpayers' obligations to SFA were in the form of full recourse promissory notes, and they made timely payments of principal through 1983. Their 1984 principal payment was not made until 1985. With Martin Kaye's [2] consent, taxpayers delayed until 1986 the interest payments due in 1982, 1983, and 1984. On December 30, 1981, the taxpayers entered into the described agreements with Sci–Teck and FTRD whereby they agreed to assume personal liability for

---

**2.** Martin Kaye, the general partner of SFA, is an independent tax and financial consultant.

SFA's obligations in the total amounts of $99,200 and $24,800, respectively.

On their disputed income tax returns for 1981 and 1982, taxpayers deducted $40,392 and $38,316, respectively, representing their distributive share of partnership losses. The Commissioner disallowed these deductions on the ground that it had not been established that the losses were actually incurred in connection with an activity in which the partnership was engaged for profit or with respect to a trade or business. The Commissioner also determined that taxpayers' investment in the partnership lacked economic substance other than the avoidance of tax.

The taxpayers then petitioned the Tax Court to redetermine the proposed tax deficiency. Their case was selected as one of two test cases involving the SFA and POGA partnerships. Following a week-long trial, the Commissioner conceded that the taxpayers could deduct their distributive shares of partnership losses attributable to oil and gas investments. The Tax Court opinion, which we review, addressed the partners' distributive shares of losses represented by payments to Sci–Teck for license fees and to FTRD for research and development. The Tax Court held that the partnerships were not entitled to the claimed deductions. Citing *Rose v. Commissioner,* 88 T.C. 386, 414 (1987), *aff'd,* 868 F.2d 851 (6th Cir.1989), the Tax Court determined that tax motivations shaped the limited partnership transactions in question and that Koppelman Process activities lacked economic substance apart from the anticipated tax benefits.[3] The Tax Court, moreover, determined that such activities were not "in connection" with the partnerships' trade or business under I.R.C. § 174.

The Commissioner conceded that taxpayers may deduct their distributive shares of partnership losses attributable to oil and gas investments and may use their distributive shares of any credits attributable thereto. The only deductions in issue, then, are the distributive shares of losses

represented by partnership payments to Sci–Teck for license fees and to FTRD for research and development. There is no dispute but that the claimed losses to be deducted must have been incurred in an activity in which taxpayers engaged for profit, and with respect to the research and development expenses, the losses must have been incurred in connection with a trade or business.

The Tax Court noted that ten percent of contributed funds to the various related partnerships was to go to working capital while seventy percent was to go to "promotions, attorneys, or network entities." The offering memorandum, however, provided that interest on the limited partners' short-term notes was to be added to working capital, estimated at $28,125 in 1982, $140,625 in 1983, and about $190,000 in 1984. Only 125 units (one-half of the total proposed) were sold. Working capital was to be maintained at $150,000. The opinion also noted that "up to 85 percent of the net cash flow generated by the oil and gas activities would be utilized to increase oil and gas holdings and to pay off the partnerships notes to FTRD (the entity created to oversee construction) and Sci–Teck." Analyses prepared by SFA and POGA, the Tax Court conceded, indicated that "projected revenues from oil and gas drilling would have been sufficient to completely retire the partnerships notes to Sci–Teck and FTRD." The same offering memorandum warned that financial success of K–Fuel development was "highly unlikely" for a number of particularized reasons, including "inadequate capital," "conflict of interests," and "commercially improved technology."

An outside firm found the significant amount of license fees to be paid to Sci–Teck to be "well within the range of normal commercial practice." This conclusion was based upon a report by a purported academic expert, which also indicated a profit to investors if one K–Fuel reactor tube was successfully constructed and became operable. A patent attorney gave an

---

**3.** Because the Tax Court found that the partnerships' Koppelman process activities lacked economic substance, it did not reach the other grounds for disallowance of a portion of the deduction as asserted by the Commissioner based on I.R.C. § 465. 91 T.C. at 750, 753.

opinion that Koppelman's patents seemed valid and that the Koppelman process had better "technological underpinnings" than others he had investigated. This attorney, Lawrence Kurland, concluded that this potential process "involved a reasonable technical risk" and was a "sound investment." One of the promoters or supervisors of the North Carolina plant, James Oronson, secured rights to use the Koppelman process "to produce char for ... charcoal briquettes." A New York law firm, purportedly involved in legal work in "a number of similar transactions" rendered a tax opinion on the organizational structure of the partnership involved and described it as "a tax structure to accomplish the desired tax end."

An expert witness in the oil and gas field, Jeffrey Lau, concluded that the assumptions used by the partnerships were reasonable and consistent with industry practice "with respect to projections and assumptions" of oil revenues and cash flows. Dr. Martin Pomerantz, an engineer expert, and an executive in a fuel conversion business, concluded "that in 1981 it would have been reasonable to predict a 1985 K–Fuel market of 520,000 tons." Two other economist academic experts, were of the opinion that the partnerships might achieve a reasonable return on investment "and had reasonable prospects of profitability in 1981," and that the price to be paid to Sci–Teck "was within the range of fair market value."

### I.R.C. Section 183 Considerations

The "general rule" as to actions covered by this section of the Internal Revenue Code dealing with "activities not engaged in for profit" is that "no deduction attributable to such activity shall be allowed" unless otherwise allowable under § 162 [4] or § 212(1) or (2).[5] Under § 183, an activity is engaged in for profit if the taxpayer entertained an actual and honest, even though "unreasonable" or "unrealistic", profit objective by engaging in the activity. Treas. Reg. § 1–183–2(a) cited in *Campbell v. Commissioner,* 868 F.2d 833, 836 (6th Cir. 1989). *Campbell* instructs that nine relevant factors are to be examined in making this determination.[6] In disallowing expenses or deductions relating to the Koppelman process or K–Fuel development under this section, the Tax Court relied heavily upon *Rose v. Commissioner,* 88 T.C. 386 (1987), *aff'd,* 868 F.2d 851 (6th Cir.1989) (decided by this court after the Tax Court decision in controversy). *Rose* involved a purchase by taxpayers of "reproduction masters" of Picasso originals while operating as Lecea Arts and claims by taxpayers of investment tax credits, depreciation, interest expense attributable to the disputed purchase. In *Rose,* the taxpayers made the purchase "[w]ithout investigation of the highly sophisticated art market," and without "any independent appraisals" of value, and the "reproductions ... had no proven market or marketability." 868 F.2d at 852. (The court noted that the "fair market value" in the tax years at issue "was negligible." *Id.*). There was no income realized from any claimed trade or business in the years in question. Admittedly, tax considerations played a "substantial role" in the purchases of what was treated as a "tax shelter" in *Rose. Id.*

4. Section 162 deals with "trade or business expenses", which are limited to "ordinary and necessary expenses paid or incurred ... in carrying on any trade of business."

5. Section 212 deals with "expenses for production of income" or "management, conservation or maintenance of property held for the production of income."

6. The factors are:
   (1) the manner in which the taxpayer carried on the activity;
   (2) the expertise of the taxpayer or his advisors;
   (3) the time and effort expended by the taxpayer in carrying on the activity;
   (4) the expectation that assets used in the activity may appreciate in value;
   (5) the success of the taxpayer in carrying on similar or dissimilar activities;
   (6) the taxpayer's history of income or loss with respect to the activity;
   (7) the amount of occasional profit, if any, which is earned;
   (8) the financial status of the taxpayer; and
   (9) whether the elements of personal pleasure or recreation are involved.
   Treas.Reg. § 1–183–2(b).

Taxpayers in *Rose* plunged into an unknown area, "and neither sought nor received information on how to exploit commercially" the reproductions obtained for an inflated price of more than one million dollars. *Id.* Accordingly, the Tax Court in *Rose* held that "[t]he [taxpayers] did not have an actual and honest profit objective in acquiring the Picasso packages, and the transactions were devoid of economic substance." *Id.* at 854. We upheld the Tax Court findings that the activity in question did not constitute a "trade or business" under I.R.C. § 162. We adopted the test in *Rose* of "whether the transaction had any practicable economic effect other than the creation of tax losses." *Id.* Since the Tax Court findings in *Rose* were not clearly erroneous, and its "analysis" was "correct," we affirmed the holding that the transaction was essentially a "sham" with "no honest profit motive." *Id.* citing *Mahoney v. Commissioner*, 808 F.2d 1219, 1220 (6th Cir.1987).

In *Rose*, however, we did not adopt the "generic tax shelter test," which was discussed at considerable length by the Tax Court in the instant case. *Id.* at 853. The concerns of the Tax Court were (1) emphasis upon tax benefits; (2) no price negotiation; (3) difficulty of valuation; (4) payment of twice the price paid by the seller licensor for limited Koppelman process rights; and (5) deferral of payment. In addition to *Rose*, the Tax Court emphasized the testimony of Michael Zukerman, tax counsel involved. The Tax Court conceded that the business partnership here, unlike the purported Rose business entity, did not lack economic substance, at least in part.

Zukerman testified that the complex financial structure was utilized to accomplish favorable tax ends. European investors committed over one million dollars for a Petrogene project and for "the Peat project" and another that did not go forward. These investors, who had a conflict of interest, to some extent, with the partnerships involved, were, according to Zukerman, "buying the [Koppelman] license."

In connection with their risk, (and, coincidentally, that of the taxpayers and the limited partnerships) "it was anticipated that the down side would be covered by reactively safe investments in oil and gas ... [and] almost eliminate the risks that would take place in the research and development area."[7] In sum, the Tax Court concluded from the Zukerman testimony "that the limited partners were to provide cash to finance the activities of the promoters for their various projects, including notably Petrogene."

The Tax Court was struck by the fact that the amount of fees in this arrangement for services (for license and for research and development) were dependent upon the number of partnership units sold, "a very strange way to run a trade or business." The experts produced by the Smiths justified this practice, and the increase in price paid for the Koppelman process license, because the carrying out of the K–Fuel project "was exceedingly risk-oriented."

We are not as impressed as the Tax Court judge was with this purportedly unusual method of procedure, or contingent arrangement, because many times promoters, salespersons, or professionals, such as attorneys or brokers or engineers, may receive a greater or lesser fee based upon success of the venture or undertaking involved. We interpret Zukerman's testimony, on the other hand, as indicating that European investors or promoters put up front end money or "pure risk capital" to acquire the license and to do initial research on feasibility "before a sale of a single unit took place," and that a sale of the license or process to the partnerships would call for an amount "to make the project economically viable" for the initial promoters and developers of the Koppelman process, who invested original substantial sums at risk in the hope it would produce a satisfactory return.

■ The Tax Court conceded in its opinion that, despite the complex and unusual nature of the over-all transaction, the

---

**7.** Zukerman added that "you had a high risk with a high reward.... [T]he K–Fuel project, although not as revolutionary [as the Petrogene project] had some very, very exciting potential."

structuring was not necessarily detrimental to the partnership, because it was not required to pay out any more than it took in, therefore characterizing the partnership in controversy as a "capital investment partnership rather than an active business to which the license fees and research and development fees were committed." We do not agree that this is a correct characterization; we conclude, rather, that the partnerships were risk venture operations carrying on a trade or business within the meaning of the tax laws.

The Tax Court challenged the substance of the fee and license payments because the payments were contingent in size or amount and because the obligation to pay involved a long term obligation. The Tax Court cited *Ferrell v. Commissioner*, 90 T.C. 1154 (1988) in support of its holding that such an extended payment did "not make sense from a business standpoint." *Ferrell*, however, involved very large multi-million notes, *not* installment notes, due in approximately twenty years to an entity which had "no capital or other funds with which to finance the acquisition of leases" needed purportedly to put the oil and gas venture into operation. The notes involved in *Ferrell* were many times more in amount than the actual cash value of leases to be acquired, and a substantial proportion were executed in *Ferrell*, when much of the program of leases for which it represented payment had already been abandoned. Also, the notes were interpreted to provide for non-recourse simple interest payable in some twenty years, and there was a "prearranged" release of individual taxpayer investors from their personal assumption of liability. 90 T.C. at 1188. *Ferrell* did indeed involve "bizarre behavior" in a "tax shelter facade ... [with] never any intention to enforce [the notes] and assumption agreements." *Id.* at 1189.

We are mindful of the considerable differences between the Ferrell and Smith arrangements. Two promoters in *Ferrell*, "neither one of whom had any oil and gas business experience," siphoned off 65% of the anticipated gross receipts of the entity involved in the face amount of $118,000,000 in long term non-recourse notes. 90 T.C. at 1188. The notes "almost certainly would not be paid" in *Ferrell*, whereas here the recourse installment notes were, in fact, paid by investors over a course of years. *Id.* at 1186. In *Ferrell*, the leases assigned to the taxpayer partnership were not only paid for, but, in addition, the Ferrell investors agreed to pay "multi-million-dollar notes" "having *no relationship to economic reality.*" *Id.* at 1186, 1187 (emphasis added). Like the situation in *Ferrell*, the amount of the notes at issue were keyed to the amount of cash to be invested by the limited partners rather than the value of the leases, but approximately $80,-000,000 of notes were executed in *Ferrell* after 62% of the proposed oil and gas program had been abandoned, and interest on the notes was deferred for some 20 years. The entity to be paid the huge amount of money in *Ferrell* clearly had no experience or means to give practical assistance in oil operations. We are persuaded that while there were some similarities between *Ferrell* and the instant controversy concerning tax shelter arrangements, the substantial differences in the cases render *Ferrell* distinguishable.

We deem the situation here to be more akin to that in *Pritchett v. Commissioner*, 827 F.2d 644 (9th Cir.1987) where the limited partner's proportionate share of liability on recourse notes on an oil and gas venture were held to be deductible for tax purposes. *See Melvin v. Commissioner*, 88 T.C. 63, 75 (1987) (limited partners who remain in "chain of liability" and have ultimate economic responsibility for the loan, payable in future years, may deduct payments), *aff'd*, 894 F.2d 1072 (9th Cir.1990). It should be noted also that oil and gas revenues from the partnerships in this case were expected to retire the partnership notes to Sci–Teck and FTRD so that not all of the taxpayers' payments were expected to be needed at the outset. We thus view the arrangement as not devoid of any business rationale or economic reality. We conclude, therefore, that the payments at issue were part of a transaction engaged in for ultimate hope of profit, and were incurred in carrying on a partnership trade

or business within the meaning of I.R.C. §§ 183 and 162. We also conclude that principal and interest payments by the Smiths were intended as expenditures for production of income within the meaning of I.R.C. § 212.[8] The transaction and investment, including execution of recourse notes, had "practicable income effects other than the creation of income tax losses." *Rose v. Commissioner,* 868 F.2d 851, 853 (6th Cir.1989).

The standard of review to be applied in review of findings of fact of the Tax Court is whether such findings are clearly erroneous. *Ratliff v. Commissioner,* 865 F.2d 97, 98 (6th Cir.1989); *Ohio Teamsters Educational and Safety Training Trust Fund v. Commissioner,* 692 F.2d 432, 435 (6th Cir.1982). On the other hand, the legal standard applied by the Tax Court and its legal conclusions based upon its findings of fact are reviewed *de novo. Ratliff,* 865 F.2d at 98.

In its factual aspect, the Tax Court's conclusion that the transactions in question lacked economic substance leaves us "with the definite and firm conviction that a mistake has been committed." *Anderson v. Bessemer City,* 470 U.S. 564, 573 (1985) (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)). We recognize that this result is at odds with the Eleventh Circuit's decision in *Karr* (see note 1, *supra* ), but under the law of this circuit the proper test is "whether the transaction has *any* practicable effects other than the creation of income tax losses." *Rose,* 868 F.2d at 853 (emphasis supplied). It is crucial, moreover, that this inquiry be conducted from the vantage point of the taxpayer at the time the transactions occurred, rather than with the benefit of hindsight. *Hayden,* 889 F.2d at 1554–56 (Nelson, J., dissenting); Treas Reg. § 1.183–2(a).

The evidence presented at trial included the following: a report concluding that the

Koppelman process was "technically, environmentally, and economically feasible;" a showing that the taxpayers' obligations to SFA took the form of full recourse notes; financial analyses indicating that projected revenues would be sufficient to retire the partnership's notes to FTRD and Sci–Teck; and uncontradicted expert testimony stating that the Koppelman process did have a reasonable chance of generating profits. These investments were risky, to be sure, and the taxpayers were predictably concerned about saving taxes—but the question is whether, apart from the anticipated tax advantages, the taxpayers' investment was a sham. On the basis of the evidence presented, it seems obvious to us that the investment was not a sham.

We are supported in our conclusion by our recent decision in *Bryant v. Commissioner,* 928 F.2d 745, (6th Cir., 1991), in which we reversed the Tax Court under circumstances similar in many respects to those present here. *Bryant* also involved a speculative venture which produced a claim of large tax losses by the investors, the Commissioner disallowing on the basis of a § 183 determination that it was a sham transaction. First we considered in *Bryant* the question as to whether a fully enforceable recourse note not contingent on the profitability of the venture was a legitimate basis for deduction under § 616(a) of the Code. (It was.) We next concluded in *Bryant* that "we review de novo the legal standard applied in determining whether or not a transaction is a sham." *Id.* at 748, citing *Rose v. Commissioner, supra.*

The standard to apply was then set out

> [I]n determining whether a transaction was a sham, the court should not address whether, in the light of hindsight, the taxpayer made a wise investment, as did the trial court here. Instead, the court must address whether the taxpayer made

---

8. "Section 162(a) allows deductions for professional and consulting fees, and travel and other miscellaneous expenses only if they are ordinary and necessary expenses incurred in carrying on a trade or business." *Hayden v. Commis-*

*sioner,* 889 F.2d 1548, 1552 (6th Cir.1989). "Section 212 allows a deduction for such expenses only if they are paid or incurred for the production of income." *Id.*

a *bona fide* investment at all or whether he merely purchased tax deductions. *Id.* at 749.

We reversed the Tax Court on the sham inquiry citing legislative history to § 183: [i]n determining whether losses from an activity are to be allowed, the focus is to be on whether the activity is engaged in for profit rather than whether it is carried on with a reasonable expectation of profit. This will prevent the rule from being applicable to situations where many would consider that it is not reasonable to expect an activity to result in a profit even though the evidence available indicates that the activity is actually engaged in for profit. For example, it might be argued that there was not a "reasonable" expectation of profit in the case of a bona fide inventor or a person who invests in a wildcat oil well.

*Id.*, quoting S.Rep. No. 552, 91st Cong., 1st Sess., *reprinted in* 1969 U.S.Code Cong. & Admin.News 1645, 2027, 2133–34.

The conclusion in *Bryant* was similar to the one we reach in this case—"a reasonable expectation of profit [subjectively] is not to be required;" rather we look to whether "the taxpayer entered the activity, or continued the activity, with the objective of making a profit ... even though the *expectation* of profit might be considered *unreasonable.*" *Id.* at 750 (emphasis added) quoting S.Rep. No. 552, *supra.* Here, as in *Bryant*, we conclude that the Tax Court was in error in questioning the transaction on the basis of whether it "was *likely* to be profitable." *Id.*

### I.R.C. Section 174

■ For expenses to be deductible under this section providing deductions for research and experimental expenditures, they must be incurred also "in connection with" the partnership trade or business, a less stringent requirement than "carrying on" a trade or business. Because expenses under section 174 are intended to stimulate new products and processes, such as energy development, taxpayers argue that they fulfill this requirement of this section.

The provisions of section 174(a)(1) "apply not only to costs paid or incurred by the taxpayer for research or experimentation undertaken directly by him but also to expenditures paid or incurred for research or experimentation carried on in his behalf by another person or organization (such as a research institute, foundation, engineering company, or similar contractor)." Sec. 1.174–2(a)(2), Income Tax Regs. *Green v. Commissioner*, 83 T.C. 667, 684 (1984).

In *Snow v. Commissioner*, 416 U.S. 500, 94 S.Ct. 1876, 40 L.Ed.2d 336 (1974), the Supreme Court, construing § 174, held that a partnership formed to develop an unpatented trash-burning device, even though no sales of product were made in the years in question, could deduct expenses for developing the new product under § 174. "The taxpayer must still be engaged in a trade or business *at* some *time,*" however, to qualify for § 174 treatment. *Green,* 83 T.C. at 686. We conclude that the claimed deductions (and those of the partnership) do qualify under § 174 since they "are sufficiently substantial and regular to constitute a trade or business." *Id.* at 687. *See also Levin v. Commissioner,* 87 T.C. 698 (1986), *aff'd,* 832 F.2d 403 (7th Cir. 1987). We cannot say that the Koppelman process activity lacked economic substance or that it was not an effort in research and experimentation within the intention of § 174.

*Snow* made it clear that "[s]ection 174 was enacted in 1954 to dilute some of the conception of 'ordinary and necessary' business expenses under § 162(a)." *Id.,* 416 U.S. at 502, 94 S.Ct. at 1878. *Snow* interpreted "in connection with" as used in § 174 to be broader than the term "in carrying on any trade or business" as used in § 162. *Id.* at 503, 94 S.Ct. at 1878.[9] We

---

9. "[S]ince the decision in *Snow,* a taxpayer need not be *engaged* in a trade or business at the time of expenditure in order to qualify for a deduction under section 174(a)(1), because that provision was intended to encourage high technology start-up ventures ... 'the taxpayer must still be engaged in a trade or business *at some time....*' *Green v. Commissioner,* 83 T.C. 667, 686 (1984)

deem the kind of enterprise to develop the Koppelman process and K–Fuel reactors as a type of *"small"* and "upcoming" partnership enterprise encouraged in *Snow*. *Id.* at 504. Since we find evidence of a profit motive in the development of the Koppelman process at issue, we conclude that *Snow* is applicable here.[10] The Tax Court found that the partnership in question, SFA, was making an "attempt to develop the Koppelman process." 91 T.C. at 736. SFA had an "exclusive right" in its limited development in North Carolina. It also purported to engage in "oil and gas drilling" and "to exploit new technology ... to convert peat [and] wood ... into a new ... clean and efficient synthetic fuel." *Id.* at 741. Kaye was engaged as consultant, a CPA, with varied business experience and a director in another oil and gas investor entity, and the K–Fuel development was described as "commercially unproven technology [with potential] environmental and health problems [and] inadequate capital." *Id.* at 743. Zukerman, who was paid as counsel in arranging the transaction by outside promoters not connected with SFA, formulated the agreements and tax structure designed to maximize tax deductions to SFA and investors such as Smith.

We conclude, despite the deferred nature of license and partnership payments, despite the high percentage of receipts going to promoters, attorneys, and developers, and despite the contingent and problematical nature of the operation, and the high risks involved, that the partnership activities, through a number of agents and outside managers and consultants, were sufficiently "substantial and regular" to constitute a trade or business for purposes of § 174. *See Green*, 83 T.C. at 687. The activities involved a risk-filled hope and design to develop a new energy source or process. Experts testified that oil and gas assumptions and projections of SFA were reasonable. Other experts pronounced it

reasonable to expect substantial production and sale of K–Fuel in North Carolina and that SFA "had reasonable prospects of profitability." *Smith*, 91 T.C. at 752.

The issues in this case are close as evidenced by the position of the dissent and the differing views of another circuit on similar facts. We readily recognize that such issues may invite different viewpoints on deductibility of the losses here involved especially as to the project's commercial feasibility. We must simply disagree with the characterization of the dissent that taxpayer's experts' testimony about "commercial viability" were of "negligible value" in distinction to what was "centered" on "technical viability of the Koppelman process."[11] We must also respectfully disagree that the "taxpayers' outlay for this venture was minimal."

We conclude, in any event, that the taxpayers' claimed interest paid on the notes to FTRD and Sci–Teck are deductible. *Rice's Toyota World v. Commissioner of Internal Revenue*, 752 F.2d 89 (4th Cir. 1985), held that even in the case of a sham transaction entered into primarily for tax benefit purposes, a taxpayers' payment of interest on a recourse note made in connection with a no profit motive arrangement was deductible. The recourse note in the instant case, as in *Rice's Toyota World*, was a "genuine" obligation, and involved "something of economic value." Such recourse notes interest is deductible even in the face of the sham nature of the underlying agreement.

> To treat a transaction as a sham, the court must find that the taxpayer was motivated by no business purposes other than obtaining tax benefits in entering the transaction, and that the transaction has no economic substance because no reasonable possibility of a profit exists.

*Id.* at 91.

We find it error to have concluded on the facts and record that the Smiths were moti-

---

(emphasis in original)." *Diamond v. Commissioner of Int. Rev.*, 930 F.2d 372 (4th Cir.1991).

**10.** Our court affirmed the Tax Court in *Snow* in disallowing the claimed deductions as not "in connection with a trade or business." The Supreme Court reversed for the reasons indicated.

**11.** The dissent seems to concede that such testimony did address "the surface question of the economic *potential* of the partnerships' activities." (Emphasis added).

vated by *"no* business purposes" and that the transaction in controversy had *"no* economic substance" nor any "reasonable *possibility* of a profit."

The Commissioner and the Tax Court were correct in examining the complex arrangement in this case carefully and with skepticism given the totality of circumstances. We believe, however, that the claimed deductions, including interest, considered under each of the code sections analyzed, do authorize a deduction as claimed subject to further examination and limitation under I.R.C. § 465. We, accordingly, REVERSE the Tax Court's disallowance under the above sections and its decision that SFA was a "generic tax shelter" rather than a "statutory tax shelter." *Id.* at 754.

### Section 6661 Considerations

Section 6661(b)(1) defines a substantial understatement of income tax as an understatement exceeding the greater of 10 percent of the tax required to be shown on the return for the year or $5,000.00.

. . . . .

As of its effective date, section 661(b)(2)(C) creates one category of "statutory tax shelters" referred to in *Rose v. Commissioner*, 88 T.C. at 407 n. 2

*Smith*, 91 T.C. 733, 766, 767.

The Tax Court found that, based primarily on the Zukerman testimony, "the principal purpose of the Koppelman Process arrangements between the limited partnerships and the other entities in the network was the avoidance of Federal income tax." *Id.* at 767–68. Taxpayers claim that they acted in good faith, although taking substantial tax deductions was, no doubt, a part of the anticipated arrangement. Based on our conclusion that the deductions were improperly disallowed, we need not pause further to discuss the § 6661 penalty. Our conclusion on the basic deductibility of the partnership claims settles it that no § 6661 penalty may attach. Our

decision requires the same result as to the added § 6621(c) assessment.

We REVERSE the decision of the Tax Court, accordingly, and REMAND for consideration of the alternative I.R.C. § 465 contention of the Commissioner in this case.

JOINER, Senior District Judge, dissenting.

I respectfully dissent from the majority opinion. Whether the partnerships were engaged in a trade or business, and whether the taxpayers entered into the transaction with a profit motive, are questions of fact, on which the Tax Court must be sustained unless its holdings were clearly erroneous. *Rose v. Commissioner*, 868 F.2d 851, 853 (6th Cir.1989). Notwithstanding that the Tax Court utilized the "generic tax shelter" inquiry disapproved of in *Rose*, here, as in *Rose*, its use of this test is not controlling. The Tax Court went on to address the appropriate questions for our purposes, and its conclusions based upon those inquiries are not clearly erroneous. The decision should be affirmed.[1]

In *Campbell v. Commissioner*, 868 F.2d 833, 836 (6th Cir.1989), we noted that Treasury Regulations section 1.183–2(b)(1)–(9) lists nine factors used in evaluating whether a transaction has been entered into with a profit motive. These factors are not exclusive. They are prefaced in the regulations with:

> In determining whether an activity is engaged in for profit, all facts and circumstances with respect to the activity are to be taken into account. No one factor is determinative in making this determination. In addition, it is not intended that only the factors described in this paragraph are to be taken into account in making the determination, or that a determination is to be made on the basis that the number of factors (whether or not listed in this paragraph) indicating a lack of profit objective exceeds the

---

1. *Karr v. Commissioner*, 924 F.2d 1018 (11th Cir.1991), the appeal from a case that was consolidated with this case in the Tax Court, reaches the same conclusion.

number of factors indicating a profit objective, or vice versa. . . .

Treas.Reg. § 1.183–2(b).

Those of the listed factors which apply to the present situation favor the resolution reached by the Tax Court. The first of the factors is the manner in which the taxpayer carries on the activity. This inquiry is further explained by the regulations as follows:

> The fact that the taxpayer carries on the activity in a businesslike manner and maintains complete and accurate books and records may indicate that the activity is engaged in for profit. Similarly, where an activity is carried on in a manner substantially similar to other activities of the same nature which are profitable, a profit motive may be indicated. A change of operating methods, adoption of new techniques or abandonment of unprofitable methods in a manner consistent with an intent to improve profitability may also indicate a profit motive.

Treas.Reg. § 1.183–2(b)(1). In this case, the record-keeping of the venture was so poor that the taxpayers were unable to produce a valid draft of the license agreement by which Ronodo derived the technology which is the heart of this venture from its inventor, making it impossible for the Tax Court to evaluate the relative value of the license in the hands of Ronodo and the partnerships. The agreement which was offered in evidence had handwritten amendments scrawled throughout, and included three addenda, one of which was also handwritten. The only paper among these which bore the signature of both the licensor and licensee was one of the addenda. The degree to which this venture was undercapitalized also distinguishes it from the normal business setting. The controllers of the venture only committed to fund each partnership with working capital of $150,000 per year. Further, had the partnerships been fully subscribed (half of the partnership units were actually sold), only $1,250,000 was to be invested in research and development in the first *23* years of the venture. Approximately 80 percent of the payments for research and development were not scheduled to be tendered until the year 2006. Lastly, the partnerships did not take steps to alter the conduct of the business in the face of the North Carolina plant's difficulties with efficiencies of scale. As if to underscore the sham nature of this transaction, one tiny plant was planned, one tiny plant was built and produced a token few pounds of fuel, and there was evidence of only cursory attempts to find an actual market for the product, *after* the plant was under construction. Given that use of the K-fuel, as the Tax Court noted, would require modification of the users' facilities, the taxpayers' arguments going to the projected cost of *producing* K-fuel as compared to other fuels do not conclude the inquiry into whether they carried out reasonable investigation, before and during the venture, as to the process' commercial viability, because the product's users would be required to make additional expenditures. The minimal and belated efforts to identify and secure purchasers for this fuel in advance are completely inexplicable under ordinary business practice.

The second factor, the expertise of the partnership or its advisors, is discussed in the regulations as follows:

> Preparation for the activity by extensive study of its accepted business, economic, and scientific practices, or consultation with those who are expert therein, may indicate that the taxpayer has a profit motive where the taxpayer carries on the activity in accordance with such practices. Where a taxpayer has such preparation or procures such expert advice, but does not carry on the activity in accordance with such practices, a lack of intent to derive profit may be indicated unless it appears that the taxpayer is attempting to develop new or superior techniques which may result in profits from the activity.

Treas.Reg. § 1.183–2(b)(2). While the partnership's activities were allegedly carried out with assistance and input from the inventor of the process himself, and, therefore, it can be presumed that the partnership had expert technical advice, the feasibility of this venture as a commercial

activity appears to have been the subject of only one study. The Tax Court found that this study, the Compunetics study, was buttressed by assumptions such as that the construction of a K–Fuel reactor was technically and financially feasible. As for taxpayer's experts, while their post-hoc testimony is not relevant to the taxpayer's preparations for this activity, their testimony about the commercial viability of this venture was also of negligible value because of its assumptions as to material facts.[2] The testimony also centered on the technical viability of the Koppelman process. However, the fact that K-fuel exists and can be produced is beside the point. The offering memorandum did not even make projections as to the profit-making potential of the Koppelman process activities. The paucity of evidence demonstrating any careful preparation for entry into commercial exploitation of the Koppelman process does not survive scrutiny under this factor.

The third of the factors is the time and energy expended by the partnership in carrying on this activity. Treas.Reg. § 1.183–2(b)(3). The partnership's minimal activity goes more directly to a holding of the Tax Court we do not reach, the issue of whether this was a passive activity. However, the economic substance of the partnership is made abundantly clear from the fact that James Aronson, who oversaw the construction of the North Carolina physical plant by a contractor, appears to have been the only employee of either the partnerships or the three corporate hierarchies set up by the promoters, who performed actual services for the partnerships rather than being a mere salaried figurehead. The general partners, Goldman and Kaye, were accountants and financial consultants. They had no familiarity with the technical process, nor did they have entrepreneurial backgrounds, and the offering memoranda informed prospective partners that they were going to take little part in the partnerships' activities. It appears that they took no part whatsoever.

The fourth factor offered by the regulations is the expectation that the assets of the partnership may appreciate in value. The record reveals that the partnership was virtually without true assets, with the exception of the small plant, which is not argued to have more than negligible value. The Tax Court regarded the principal assets of the partnerships as the technology licenses, and noted that the offering memorandum stated that they were impossible to value. In addition, as discussed above, the validity of the underlying license to Ronodo is questionable at best, and the subsidiary licenses likewise.

The fifth factor suggested by the regulations is the success of the partnership in carrying on other similar or dissimilar activities:

> The fact that the taxpayer has engaged in similar activities in the past and converted them from unprofitable to profitable enterprises may indicate that he is engaged in the present activity for profit, even though the activity is presently unprofitable.

Treas.Reg. § 1.183–2(b)(5). As noted above, there was no evidence that the principals of this venture had entrepreneurial expertise outside of the tax-oriented investments field. As for the partnership itself, not only did its Koppelman process activities generate losses, its oil and gas exploration activities did also.

The sixth and seventh factors cited in the regulations go to the existence and extent of long-term profitability, which is inapplicable to the present situation, involving the initial years of the partnerships. The eighth factor addresses the extent to which the investment at issue involves a substantial investment by the taxpayer, which would suggest an emotional investment in the profitability of the activity (a form of at-risk inquiry). Here, the offering materials stipulated that the partners should have

---

**2.** The first of the three reports offered by the taxpayers, that of Lam, addressed the oil and gas revenue projections and not the Koppelman process activities. The second, authored by Pomerantz, discussed the market potential of K-fuel slurry rather than the product produced by the North Carolina plant. The Plummer and Thomas report, third, was predicated on the assumption that the partnership would enter into a joint venture with a utility.

large outside incomes, in order to utilize the tax benefits from the partnerships. The taxpayers' outlay for this venture was minimal, and the deductions taken by the taxpayers at issue realized the promoters' four-to-one tax benefits projection. The ninth factor is not met here, since the taxpayers did not engage in the present activities for personal pleasure or recreation.

The facts related to the nine factors listed in Treasury Regulations section 1.183–2(b)(1)–(9) do not support a holding that the Tax Court's conclusions were clearly in error, and inquiry into the totality of the circumstances evidences that the Tax Court, far from being in error, was clearly correct. A number of aspects of the transaction here emit a strong odor of sham. The trio of corporate hierarchies set up by the promoters to provide the "license" and "services" to the partnerships speak for themselves. Particularly absurd is the "research and development" services offered by FTRD, which was to "coordinate" the activities of Koppelman himself and others with K–Fuel experience that FTRD, or rather its sole active employee, Aronson, did not have. It is apparent that the corporate hierarchies were actually formulated as thinly-veiled means of channelling the majority of the partners' investment back to the promoters, through the promoters' equity interests in the corporations and through their salaried positions as officers and directors of the corporate entities. The economic substance of the arrangement, however, is that the promoters sold tax deductions to the partners.

The partners did not contemplate the partnerships as activities for profit not because the Koppelman process itself lacks validity—it was no doubt carefully chosen by the promoters expressly because it has arguable potential as an alternative energy source—but because the business entity which was set up here was impracticable in

numerous respects. The Tax Court's conclusion that "[a]ctual control rested in persons whose compensation from these partnerships depended *solely* on capital contributions, while they had interests in the *profitability* of competing ventures" (emphasis in original) is both uncontroverted and of undeniable import. There are other indications that the principals of the venture had no intention of seriously pursuing it, particularly the licensing arrangements. The imperfect documentation and non-recourse nature of Koppelman's license to Ronodo clearly show the sham nature of the transaction. The Tax Court found also that the prices charged the partnerships for their licenses, as well as for other services, were not set by market forces, but were formulated with a view toward satisfactory return on the promoters' capital, and accepted by the partners without negotiation.[3] I would argue that the fact that Koppelman later sold the United States rights to the Koppelman process for more than 20 times the price paid by Ronodo under the most generous construction of the "license" speaks not to the entrepreneurial savvy of the promoters, but to the fact that the partnerships were known to Koppelman and the purchasers of the rights to be tax-oriented rather than potential competitors.

It was perfectly apparent to purchasers of partnership units that the partnerships dealt only with corporations controlled by the promoters, that none of the web of commitments of the partnership had been negotiated at arms' length, that the principals and contractors to the partnership had no experience in relevant endeavors, and other facts communicating the insubstantial nature of the enterprise. These partnerships were not business ventures, they were paper montages of likely Tax Court arguments.

---

**3.** The taxpayers' experts did not "justif[y] this practice." The experts merely concluded that the fees charged were within the range of reasonableness. The fact that the amount of the fees might have been reasonable if they had been arrived at through market forces, however, is irrelevant to the significance of the testimony in the Tax Court that the *method* by which the

fee was actually derived was from the promoters' client's stated expectations as to the return he wanted on his investment. This method of setting the fees had nothing to do with the "success" of the venture, since these fees were purportedly being paid to the corporate entities for their services, not to the promoters for their promotional expertise.

It does not controvert the significance of the other facts at issue to say that the income from the oil and gas activities of the partnership might have covered the expenses of the Koppelman process activities. It may be that the Koppelman process itself is commercially feasible. However, as the Tax Court clearly pointed out, it was the structure of this venture, the conflicts of interest, and other factors separate from the economic viability of the processes at issue, which demonstrate that the investors had no profit motive. The experts offered by the taxpayers who found the oil and gas projections reasonable, addressed merely the surface question of the economic potential of the partnerships' activities. However, there was no serious intent to pursue those activities, and the purchasers of the partnership units, to whom the partnerships were marketed as tax-oriented investments, had no expectation that the partnerships would be commercially successful. The principals of this venture had no incentive to make it a success, the venture had inadequate funding to make it a success, and there is no evidence of attempts to make the venture a success after the failure of the activities originally planned, despite the fact that the partners had an obligation to fund the partnerships for the next twenty years. Viewing the above circumstances as a whole, I would affirm the Tax Court's finding that there was no profit motive under section 183, and that SFA was engaged in a sham transaction rather than a "trade or business" entitling it to deductions under section 174.

The rules announced in *Bryant* support the conclusion reached in this opinion. There is ample evidence, as pointed out above, to support the conclusion of the Tax Court, and independent *de novo* consideration of the evidence, also as outlined above, indicates that the transaction was a sham in that it had little possible economic effect other than the creation of income tax losses.

The majority's reliance on *Bryant* for the proposition that the likelihood of profit does not control the determination whether the taxpayer had a profit motive, is mis-placed. The *Bryant* opinion states that an "unreasonable" expectation of profit involves a "small chance for a large profit." While this definition fit the gold- and silver-mining at issue in *Bryant*, it does not describe the situation here. In addition, the question of the commercial feasibility of the Koppelman process is far outweighed by other aspects of the transaction, all of which are relevant under the totality-of-the-circumstances inquiry dictated by the regulations.

Deduction of Interest

The Tax Court should also be affirmed as to its disallowance of deductions taken by the partners for interest on the partnerships' notes to FTRD and Sci–Teck. The taxpayers rely on *Rice's Toyota World, Inc. v. Commissioner*, 752 F.2d 89 (4th Cir.1985), for the proposition that they are entitled to take deductions for obligations which have economic substance, even if entered into pursuant to a venture lacking substance. The taxpayers assert that the interest on the partnership's notes to FTRD and Sci–Teck may be taken by them as a deduction. In *Rice's Toyota World*, however, the taxpayer had given a full-recourse note obligating the taxpayer to pay both principal and interest. Here, the taxpayers' note only assumed the obligation to pay their proportionate share of the *principal* amounts due to FTRD and Sci–Teck. The Tax Court found that the partnerships were unlikely ever to have funds to pay their interest obligations, therefore the interest payments of the partnerships could not be said to have economic substance as to the taxpayers. The Tax Court properly concluded, under the "all events" test of Treasury Regulations section 1.461–1(a)(2), that the taxpayers were not entitled to deduct the interest on the partnerships' notes.

Penalties

I would also affirm the holdings of the Tax Court as to the penalty for substantial understatement of income tax under section 6661, and the penalty for understatement of income tax due to a tax-oriented

**1104**

investment under section 6621(c), for the reasons stated above.