**Steven G. HILL; Parilea Hill, Petitioners–Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.**

No. 99–70101.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 7, 2000

Decided March 1, 2000

---

Michael R. Matthias, Jeffrey P. Berg, Stuart R. Singer; Matthias & Berg, Los Angeles, California, for the petitioners-appellants.

Richard Farber and Kenneth W. Rosenberg, Tax Division; United States Department of Justice; Washington, D.C., for the respondent-appellee.

Before: MAGILL,[1] HAWKINS and THOMAS, Circuit Judges.

THOMAS, Circuit Judge:

This appeal presents the question of whether the tax court correctly decided *Krause v. Commissioner,* 99 T.C. 132, 1992 WL 178601 (1992), a test case involving numerous limited partnerships formed to invest in enhanced oil recovery technology. The Tenth Circuit affirmed *Krause* in *Hildebrand v. Commissioner,* 28 F.3d 1024 (10th Cir.1994). We agree with the Tenth Circuit's analysis and affirm the tax court's judgment.

## I

This appeal arises from an elaborate tax shelter constructed during the late 1970s and early 1980s. Petitioners invested, as

---

1. The Honorable Frank J. Magill, Senior United States Circuit Judge for the Eighth Circuit, sitting by designation.

limited partners, in Garfield Oil and Gas Associates ("Garfield Partnership"), a Utah limited partnership allegedly designed to exploit alternative methods of oil recovery during the fuel crises of the time. Garfield's general partners were Richard Basile and Glenda Exploration and Development Corporation ("GEDCO"). Basile had no prior experience in the oil and gas business; his expertise lay in the creation of limited partnership tax shelters. GEDCO and Basile were also the general partners of Technology Oil and Gas Associates Partnership 1980, the Utah limited partnership at issue in *Hildebrand*. These partnerships were two of sixteen substantially identical partnerships referenced in the *Krause* opinion as the "Manhattan Partnerships," created by a group that included Werner Heim and Winsor Savery. The stated objectives of the Manhattan Partnerships were to (1) drill and operate oil and natural gas wells and (2) recover oil from tar sands using licenced enhanced oil recovery technology.

The Garfield Partnership offered limited partnership units for sale to qualified investors. The offering memorandum focused on the tax advantages investors would obtain from the investment, describing how $30,000 of cash investments would produce $150,000 of tax losses over a period of four years.[2] *See Krause*, 99 T.C. at 146. Two hundred fifty limited partnership units were offered for sale. The total subscription price for each limited partnership unit was $230,000, with $10,000 paid in cash. The remainder was due in installments: $10,000 due March 1, 1982; $30,000 due on December 31, 1992, December 31, 1993, December 31, 1994 and May 31, 1995; and $80,000 due on December 31, 2005. The offering memorandum described $120,000 of the debt as recourse and $80,000 as non-recourse.

In furtherance of its described objectives, the Garfield Partnership engaged in two projects: (1) purchase of working in-

terests in a natural gas field near Monroe, Louisiana, and (2) acquisition of real property to develop oil from tar sands. The interest in the Monroe natural gas field was not purchased from a third party; rather, it was procured from one of GEDCO's affiliate companies, Glenda Petroleum. Contrary to the representation in the offering memorandum, the wells were exploratory rather than developmental. The specific locations at which the wells were to be drilled had no known gas reserves and the Garfield Partnership did not intend to use enhanced oil recovery technology there. When initial drilling was unproductive, the Garfield Partnership and Glenda Petroleum entered into an agreement substituting locations in Ohio and West Virginia. The substitution was financially beneficial to the Garfield Partnership's general partners individually. However, no substantial profit was ever produced for Garfield Partnership itself, nor the limited partners. It did, however, generate the tax losses the limited partners expected.

Development of the tar sand project produced equally dismal real world results. Tar sand does not contain oil as such; it is a deposit of loose sand or partially consolidated sandstone that is saturated with highly viscous hydrocarbon deposits known as bitumen. Recovery of oil from tar sand is difficult and expensive. The Garfield Partnership proposed using unproven technology on tar sand property located in Wyoming and Utah. Both the licenses for use of enhanced oil recovery technology and the tax sand property itself were acquired from related parties. Technology licenses were obtained from Elektra Energy Corporation ("Elektra"), a wholly owned subsidiary of Petrotec Systems, A.G., a Swiss corporation controlled by Werner Heim. Heim and Winsor Savory served at various times as President of Petrotec Systems. They also managed

---

**2.** At the time these shelters were first marketed the highest individual tax rate was 70%, *see* 26 U.S.C. § 1 (1980); therefore, in 1980, a $10,000 investment that produces a $40,000

loss (as outlined in the offering memorandum) had a value of $28,000 to the taxpayer, a gain of $18,000 or a 180% return on the investment.

and operated Elektra. Elektra had acquired non-exclusive rights to the technology from Centurian Planning, Inc, a corporation owned and operated by Winsor Savery, who had, in turn, obtained the rights from the developers. Thus, even though the technology could have been licensed directly from its developers on more attractive terms, the Garfield Partnership chose to deal with a related party. The financial structure of the Garfield–Elektra transaction was unusual for an undeveloped, high-risk technology. Rather than paying a simple royalty for technology use, as Elektra had, Garfield agreed to make substantial cash payments in the form of fixed annual fees. This resulted in immediate profit for Elektra and its investors, but only produced tax losses for investors in the Garfield Partnership. The annual fee was not based on any market rate. Instead, it was determined by the number of Garfield Partnership units sold.

A similar circumstance occurred in the acquisition of the tar sands. The property acquired by the Garfield Partnership was purchased from Tex–Oil International Corporation ("Tex–Oil"). Tex–Oil was organized by Winsor Savery, and 95% of its revenues were passed along to Centurion Planning, Inc., which, as previously noted, was also owned and operated by Savery. The tar sand properties were purchased by Tex–Oil for $100 an acre. Seven months later, the properties were leased to the Garfield Partnership not on a per-acre basis, but for $5,000 for each limited partnership unit outstanding in each of the twenty years of the lease term. At the time the lease was executed, the oil in the affected tar sand properties was not recoverable in commercial quantities by any known method, including enhanced oil recovery technology. Despite this, the Garfield Partnership was obligated to pay $21,150,000 over a twenty year period, plus royalties if development ever occurred. The net result was enormous profit to the related companies and a substantial tax loss to the Garfield Partnership and its limited partner investors.

As a generator of tax losses, the Garfield Partnership was an unqualified success. However, the short-lived tax tour-de-force ended when the Commissioner of Internal Revenue ("Commissioner") determined that the partnerships were tax shelters and were not engaged in for profit. The Commissioner therefore disallowed deductions for business expenses as well as interest deductions for the petitioner's share of the partnership debt. The Commissioner also imposed an increased interest penalty because the investments were tax motivated transactions. The tax court upheld these determinations. The petitioners timely appealed.

The petitioners and the Commissioner entered into a stipulation that the case of *Krause v. Commissioner,* 99 T.C. 132, 1992 WL 178601 (1992), would serve as the opinion in this case since *Krause* was a test case involving the same group of partnerships and the same issues. The stipulations further agreed that the record in *Krause* would serve as the record in this case.

■ We review decisions of the tax court under the same standards as civil bench trials in the district court. *See Estate of Rapp v. Commissioner,* 140 F.3d 1211, 1214 (9th Cir.1998). Although a presumption exists that the tax court correctly applied the law, no special deference is given to the tax court's decisions. *See AMERCO, Inc. v. Commissioner,* 979 F.2d 162, 165 (9th Cir.1992). Therefore, we review the tax court's conclusions of law de novo, *see Boyd Gaming Corp. v. Commissioner,* 177 F.3d 1096, 1098 (9th Cir.1999), and the tax court's factual findings for clear error, *see Harbor Bancorp & Subsidiaries v. Commissioner,* 115 F.3d 722, 727 (9th Cir.1997).

II

■ "Uniformity among Circuits is especially important in tax cases to ensure equal and certain administration of the tax system" and we therefore would "hesitate

to reject the view of another circuit." *Pacific First Fed. Sav. Bank v. Commissioner*, 961 F.2d 800, 803 (9th Cir.1992) *quoting First Charter Financial Corp. v. United States*, 669 F.2d 1342, 1345 (9th Cir.1982). Because we agree with the Tenth Circuit's conclusions, we hereby join its opinion in *Hildebrand* and affirm the tax court in its entirety. Although we will not repeat the Tenth Circuit's analysis, a few issues require some elaboration.

## A

■ The tax court correctly held that the partnerships at issue lacked a profit motive under 26 U.S.C. § 183, which applies to partnerships despite the statute's failure to mention them. *See Wolf v. Commissioner*, 4 F.3d 709, 712–13 (9th Cir. 1993). Further, it is well established that the determination of an existing profit motive is made at the partnership level and does not address the subjective intent of the particular partner in question. *See Polakof v. Commissioner*, 820 F.2d 321, 323 (9th Cir.1987); *Wolf*, 4 F.3d at 713.

■ The tax court correctly applied the relevant factors as set out in 26 C.F.R. § 1.183–2(b)(1)–(9). The determination of the existence of a profit motive is a question of fact, *see Hildebrand*, 28 F.3d at 1026, and petitioners have not demonstrated that the tax court's findings of fact were clearly erroneous. At best, petitioners "manage only to show that their activities might have had a profit motive; they do not show that the Tax Court was clearly erroneous in finding that the generation of large tax losses was in fact the dominant motivation behind the [partnerships]." *Independent Electric Supply, Inc. v. C.I.R.*, 781 F.2d 724, 727 (9th Cir.1986).

■ Indeed, the thrust of petitioner's argument is that the partnership failed because world oil prices unexpectedly plummeted. It is true that, under the best of circumstances, oil prices are difficult to predict with precision. However, inaccurate pricing scenarios had little to do with the tax loss in this case because production never occurred in commercial quantities as a result of either venture. Rather, the bulk of the losses were generated by the Garfield Partnerships contractual obligations to related parties which bore little relationship to the true market and virtually no relationship to oil price. Indeed, the tax losses occurred almost exactly as predicted in the offering memorandum. Thus, the tax court did not clearly err in its factual finding that the Garfield Partnership lacked a profit motive.

## B

■ The tax court correctly ruled that the petitioners are not entitled to interest deductions because the debt obligations are not genuine. During the years at issue the Internal Revenue Code provided that "[t]here shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness." 26 U.S.C. § 163(a). However, before such interest is deductible, the underlying debt must be determined to be genuine. *See Knetsch v. United States*, 364 U.S. 361, 365–66, 81 S.Ct. 132, 5 L.Ed.2d 128 (1960). When assessing whether a debt is genuine, courts examine whether the debt obligation operates to affect the interests of the taxpayer in any way other than to produce a tax loss. *See id.* at 366, 81 S.Ct. 132. Of additional importance is the probability that the debt will ever be repaid. *See id.* at 366 n. 3, 81 S.Ct. 132. Ultimately, "debt created for the exclusive purpose of generating tax savings is not genuine and must be disregarded for tax purposes." *Agro Science Co. v. Commissioner*, 934 F.2d 573, 575 (5th Cir.1991).

Discussing the debt obligations in our context, the tax court stated:

> They did not reflect arm's-length obligations, and they are not to be recognized as legitimate obligations of the partnerships. The debt obligations of the partnerships associated therewith did not constitute genuine debt obligations and are to be disregarded.

*Krause*, 99 T.C. at 175. The tax court's determination that the debt did not consti-

tute genuine obligations is linked directly to the determination that the Garfield Partnership lacked a profit motive. The tax court pointed to the organizational structure of the business operations and concluded the "stacking" of obligations had the sole purpose of producing "debt obligations in staggering dollar amounts, using a largely undeveloped and untested product". *Id.*

Petitioners argue first that the tax court had already decided the debt obligations were genuine in its opinion on the parties' summary judgment motions. However, this is incorrect: the tax court was very careful to state that it only assumed the debt obligations were genuine for purposes of analyzing the summary judgment motions. *See Krause v. Commissioner,* 92 T.C. 1003, 1021, 1989 WL 48000 (1989).

Petitioners next argue that this case is very similar to *Smith v. Commissioner,* 937 F.2d 1089 (6th Cir.1991) and *Pritchett v. Commissioner,* 827 F.2d 644 (9th Cir. 1987) both of which involved oil and gas partnerships and both of which determined, at least nominally, that the partnerships' debt obligations were genuine. *Smith* is plainly distinguished by the fact that the court found the partnership had a profit motive and was engaged in a legitimate business activity. Similarly, it must be noted that the same partnerships at issue in *Smith* were also reviewed in *Karr v. Commissioner,* 924 F.2d 1018, 1025 (11th Cir.1991), where the court held the partnerships were sham transactions and disallowed the deductions. As a result, *Smith* provides only limited support for petitioners' argument.

■ In *Pritchett* there was no issue as to the profit motive of the partnership and there we held that the deductions were permitted because the limited partners were ultimately liable for the debt payments. *See Pritchett,* 827 F.2d at 647. However, the mere recourse nature of debt does not necessarily end the inquiry because, "[e]ven if recourse, a note will not be recognized if its payment is unlikely." *Waddell v. Commissioner,* 86 T.C. 848,

902, 1986 WL 22124 (1986), *aff'd* 841 F.2d 264 (9th Cir.1988).

■ Although the tax court did not specifically state that it disbelieved that the debt would be paid, that is the obvious import of its decision. Since there was no meaningful collateral given to support the debt and since the prices paid for the licensed technology and the real estate interests were far in excess of the fair market value, the tax court's conclusions are not clearly erroneous.

## C

■ The imposition of the increased interest rate under 26 U.S.C. § 6621(c) (1987) was proper based on Tres. Reg. § 301.6621–2T A–4(1) because the Garfield Partnership lacked a profit motive under § 183; thus, the investments qualified as tax motivated transactions. 26 U.S.C. § 6621(c)(1) provides that "with respect to any substantial underpayment attributable to tax motivated transactions, the rate of interest established under this section shall be 120 percent of the underpayment rate established under this section."

The code further defines a "tax motivated transaction" in 6621(c)(3) as:

(A) In general.—For purposes of this subsection, the term "tax motivated transaction" means—

(i) any valuation overstatement (within the meaning of section 6659(c)),

(ii) any loss disallowed by reason of section 465(a) and any credit disallowed under section 46(c)(8),

(iii) any straddle (as defined in section 1092(c) without regard to subsections (d) and (e) of section 1092),

(iv) any use of an accounting method specified in regulations prescribed by the Secretary as a use which may result in a substantial distortion of income for any period, and

(v) any sham or fraudulent transaction.

(B) Regulatory authority.—The Secretary may by regulations specify other types of transactions which will be treated as tax motivated for purposes of this subsection. . . .

At issue here is Treasury Regulation § 301.6621–2T wherein the following is set out in question and answer form:

Q–4. Are there any transactions other than those specified in A–2 of this section and those involving the use of accounting methods under circumstances specified in A–3 of this section considered tax motivated transactions under A–2(6) of this section?

A–4. Yes. Deductions disallowed under the following provisions are considered to be attributable to tax motivated transactions:

(1) Any deduction disallowed for any period under section 183, relating to an activity engaged in by an individual or an S corporation that is not engaged in for profit. . . .

In *Hildebrand* this issue was dealt with summarily:

We specifically reject Krause's assertion that the Tax Court erred in finding Barton Income Fund liable for an increased rate of interest because a transaction which is determined to lack a profit motive does not equal a tax-motivated transaction under section 6621. Section 6621(c)(1) imposes an increased rate of interest on "any substantial underpayment attributable to tax motivated transactions," which include activities not engaged in for profit.

28 F.3d at 1028. The reasoning in *Hildebrand* is sound: the Secretary has authority to define certain transactions as tax motivated, the Secretary has defined transactions lacking a profit motive under § 183 as tax motivated, the transactions in this case lack a profit motive under § 183, petitioners activities relating to these transactions are therefore tax motivated.

A close examination of § 6621(c) demonstrates that the Secretary is well within the granted regulatory power to simply equate the violation of one code section with a violation of § 6621(c).

Section 6621(c)(3)(A)(i) imposes increased interest on "any value overstatement (within the meaning of section 6659(c))." Section 6659(c) defines a value overstatement as any time the claimed value or adjusted basis of property is 150% or more of the actual value or adjusted basis. Section 6621 requires no inquiry into the subjective state of mind of the individual making the claim or any requirement that there be something more than the mere violation of § 6659(c).

Similarly, § 6621(c)(3)(A)(ii) imposes the increase on any loss disallowed under § 465(a) or any credit disallowed under § 46(c)(8). Section 465 limits the amount of possible deductions to the amount an individual has at risk in the venture. The calculations under § 465 look solely to the transaction itself, meaning the value of pledged property or whether debt is recourse or nonrecourse and not to the individual's subjective state as to whether he thinks he's at risk. Section 46(c)(8) limits the value of certain investment credits so that a credit cannot be had on that portion of an "investment" which is comprised of nonrecourse debt. Again, § 6621 operates to impose the penalty without consideration of anything beyond the bare requirements of the referenced code sections.

These, and the remaining "tax motivated transactions" set out in § 6621(c)(3)(A) show a legislative pattern established by Congress which treats violations of certain code sections as implicit violations of § 6621(c). The Secretary simply followed this pattern pursuant to the regulatory authority granted in § 6621(c)(3)(B) by establishing regulations that make a violation of § 183 a tax motivated transaction.

Petitioners bear the burden of proof when disputing the application of the increased interest rate to them. *See Rybak v. Commissioner*, 91 T.C. 524, 567, 1988 WL 92157 (1988). Given the clear error standard of review, petitioners fall far be-

low the threshold for showing that the tax court erred in its factual determinations.

AFFIRMED