889 F.2d 1548
 65 A.F.T.R.2d 90-343, 89-2 USTC P 9642
 Donald HAYDEN, Agnes Hayden, William P. Young, Mary E.
Young, Lidio Medina, Patricia Medina, Donald L. Baltz,
Judith H. Baltz, Carl Nagy, Dennis A. Lynch, Mary A. Lynch,
Peter Nunez, Virginia Nunez, Robert J. Flynn, Julene F.
Flynn, Petitioners-Appellants,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.
 No. 88-1964.
 United States Court of Appeals,
Sixth Circuit.
 Argued Sept. 25, 1989.
Decided Nov. 22, 1989.
 
 Howard K. Schwartz (argued), West Bloomfield, Mich., for petitioners-appellants.
 William F. Nelson, I.R.S., Gary R. Allen, Acting Chief, William S. Rose, Jane S. Kimball, Ann Belanger Durney (argued), U.S. Dept. of Justice, Appellate Section Tax Div., Washington, D.C., for respondent-appellee.
 Before: KENNEDY and NELSON, Circuit Judges, and WISEMAN, Chief District Judge.*
 KENNEDY, Circuit Judge.
 
 
 1
 Taxpayers appeal the decision of the United States Tax Court determining deficiencies in their federal income taxes from the disallowance of partnership loss deductions taken with respect to their investment in a tax shelter known as the Food Rethermalization Limited Partnership (Food Rethermalization).[1] We hold that the Tax Court was not clearly erroneous in its findings and did not err in concluding that the taxpayers had failed to prove the transactions were entered into with a bona fide profit objective, and thus correctly sustained the deficiencies determined by the Commissioner. We also find that the Commissioner properly allowed a deduction for interest paid on the partnership's recourse note. Accordingly, we AFFIRM the decision of the Tax Court.
 
 
 2
 The following is a condensed version of the facts found by the Tax Court. The transactions here had their genesis when James Souder, a consultant involved in the design of hospital food preparation and service systems, had the idea that a system using induction heating would provide a better product and save on labor costs when compared to microwave and convection ovens, the systems then used for reheating hospital patients' foods. Souder had approximately ten years' experience in designing various systems for hospitals.
 
 
 3
 Souder contacted Lindsey Waldorf, who had experience in the engineering and electronic fields. Souder and Waldorf agreed to design and build a prototype for a system using induction heating. In 1975, the two filed a patent application with the United States Patent Office, claiming inventions for a method and apparatus for rethermalizing food using induction heating (the "transtherm unit") and for specially designed containers in which the food was to be reheated. The Patent Office issued patents for these devices.
 
 
 4
 Souder solicited several manufacturers in order to find a corporate sponsor that would have the financial capacity to complete the design of and subsequently market commercial products using the patented transtherm unit. One such manufacturer, Market Forge, a division of Beatrice Foods Corporation, signed a Memo of Understanding with Waldorf and Souder. Under the terms of this memo, Waldorf and Souder were to complete a prototype of their invention at a cost of $25,000, assign their patents to the technology to Market Forge, and assist in marketing and engineering the product. Waldorf and Souder also were to grant Market Forge a right of first refusal in the event that either or both made any additional developments that were related to the product. In return, Market Forge was to pay a royalty to Waldorf and Souder for each unit sold. In a later letter to Henry Coletti, Market Forge's vice president of sales and marketing, Waldorf and Souder indicated that they had agreed to grant Market Forge an exclusive license for use of the patents in a hospital food rethermalization system, rather than assign the entire patent to Market Forge.
 
 
 5
 Souder developed projections of sales of the transtherm unit in the hospital market over the life of the patent as well as estimates of sales of the unit in other markets, including schools, transportation facilities and nursing homes. Market Forge made its own projections before signing the Memo of Understanding. Market Forge's projections were more pessimistic than Souder's because they allowed a longer development time as well as time for health and safety approvals from various organizations.
 
 
 6
 In September or October of 1976, Waldorf and Souder were introduced to Robert Flynn and Peter Nunez, who owned an organization that marketed financial products, life insurance, tax shelters and real estate investments. Flynn had a degree in hotel and restaurant management from Cornell University and had served from 1958 to 1963 as an officer in the Army Quartermaster Corps, where he had managed officers' clubs and hospitals. After viewing the prototype then available, informally consulting with individuals at Cornell, and reviewing Souder's market projections, Flynn began organizing clients to invest in Waldorf's and Souder's invention.
 
 
 7
 Three entities were created in December of 1976 in order to carry out the transaction. The first was Transtherm Limited Partnership (Transtherm), a Michigan limited partnership, with Waldorf and Souder as general partners. As their capital contribution to Transtherm, Waldorf and Souder transferred to it all of their right, title and interest in the pending patent application. The second entity was Patents Licensing International (PLI), a Michigan corporation, with Schwartz (Waldorf and Souder's attorney) as the sole shareholder. The third entity was Food Rethermalization, a Michigan limited partnership, with Nunez and Flynn as its general partners. Food Rethermalization had 11 limited partners, including appellants Donald Hayden, William P. Young, Lidio Medina, Donald L. Baltz, Carl Nagy, and Dennis A. Lynch. Taxpayers Peter Nunez and Robert Flynn were the sole general partners.
 
 
 8
 Before investing, the limited partners were provided with an offering memorandum that described the patents, the transactions and the parties thereto; indicated that Market Forge was then involved in the development of commercial products; and listed several economic risk factors to be considered. Six of the 17 pages were devoted to the tax considerations of the transaction. The potential limited partners were provided, by means of a separate document, with the market projections prepared by Souder, as well as the promotional material he had used in soliciting manufacturers. They were also afforded the opportunity to view a demonstration of the unit, although not all of them did so.
 
 
 9
 In December of 1976, none of the parties involved in the formation of the three entities, except Waldorf and Souder, anticipated that they or the entities would be involved in the continued development of commercial products utilizing the inventions or in the active marketing of the transtherm units. They anticipated that the work would be done by Market Forge, with Waldorf and Souder assisting on a consulting basis.
 
 
 10
 On December 29, 1976, Transtherm transferred all of its right, title and interest in the patent application to PLI, in exchange for between 5 percent and 7 1/2 percent of the revenue derived from exploitation of the invention, with the exact percentage depending on royalties received by PLI. At or about the same time, PLI entered into a seven-year Exclusive License Agreement with Food Rethermalization. Under the license agreement, Food Rethermalization was to pay PLI an $80,000 consulting fee, $30,000 of which was to be paid upon execution of the license agreement with the balance to be paid by May 15, 1977. The payment due on May 15, 1977, was evidenced by a promissory note. Both of these amounts were paid. Food Rethermalization also was to pay PLI a $3,320,000 license fee. Four hundred and twenty thousand dollars ($420,000) of the license fee was evidenced by a full recourse installment note, bearing interest at seven percent per year, to be fully paid by December 11, 1981. The first three installments on the note, totalling $250,000, were paid; the remaining installments were not. The $2,900,000 balance of the license fee, bearing interest at seven percent per annum, was evidenced by a nonrecourse promissory note which was due and payable in December 1983. Thirty percent of Food Rethermalization's gross income from exploiting the inventions was to be used to retire the nonrecourse note. Because no income was received by Food Rethermalization, no payments were made on the nonrecourse note. The parties do not dispute that based upon the projected tax benefits resulting from the depreciation of the license fee, the investing taxpayers would receive more in tax benefits during the first two years of their investment than their total cash investment.
 
 
 11
 The license agreement contained an option to renew at the end of the seven-year term for the remaining life of the patents, upon payment of the greater of $25,000 or three percent of the income received by Food Rethermalization from exploitation of the inventions during the initial term. In the event the license agreement was renewed, the due date of the $2,900,000 nonrecourse note was similarly extended. The license agreement was renewed after seven years, and Schwartz, on behalf of PLI, waived the $25,000 fee.
 
 
 12
 In early 1977, Transtherm, PLI and Food Rethermalization signed an agreement with Market Forge in which they granted Market Forge an exclusive license to use the patents during the patents' lifetimes. During 1977, Market Forge continued to work on the development of the transtherm unit. Problems were experienced in finishing the prototype, partly because of attempts to increase its performance level. Because the projected cost of the unit was increasing, Market Forge felt that it would be more difficult to market than they had anticipated. Finally, Market Forge was unable to locate a dish supplier who could produce dishes with the necessary metal content (to control heating) that also looked like ordinary china plates, which was a key element in marketing the unit. Because of these difficulties, Market Forge withdrew its support on June 26, 1978.
 
 
 13
 On its 1977 federal partnership tax return, Food Rethermalization claimed an amortization deduction for the license agreement, using a seven-year life and claiming that the agreement had been in service for two-thirds of the year. On its 1978 federal partnership tax return, Food Rethermalization claimed a full year amortization deduction with respect to the license agreement.
 
 
 14
 Appellants argue that the Tax Court erroneously denied their claimed deductions because the court erred in finding that Food Rethermalization did not enter into the license agreement with the requisite profit motive. Appellants submit that they are not arguing that the authority relied upon by the Tax Court was misplaced but rather that the Tax Court failed to rely on the authority it correctly claimed was controlling. A closer examination of appellants' argument, however, reveals that appellants are simply arguing that the Tax Court erred in failing to find that a profit motive existed.[2]
 
 
 15
 The Internal Revenue Code provisions under which Food Rethermalization sought deductions require a profit motive. Section 167(a)[3] allows depreciation deductions only if the property for which the deduction is sought is used in a trade or business or held for the production of income. 26 U.S.C. Sec. 167(a). Section 162(a) allows deductions for professional and consulting fees, and travel and other miscellaneous expenses only if they are ordinary and necessary expenses incurred in carrying on a trade or business. 26 U.S.C. Sec. 162(a). Section 212 allows a deduction for such expenses only if they are paid or incurred for the production of income. 26 U.S.C. Sec. 212.
 
 
 16
 The threshold inquiry in determining whether an activity is a trade or business or is carried on for the production of income is whether the activity is engaged in for the primary purpose and dominant hope and intent of realizing a profit.[4] Godfrey v. Commissioner, 335 F.2d 82, 84 (6th Cir.1964), cert. denied, 379 U.S. 966, 85 S.Ct. 660, 13 L.Ed.2d 560 (1965). In this context, "profit" means economic profit, independent of tax savings. Campbell, 868 F.2d at 836. The burden of proving the requisite profit motive is on the taxpayer. Rules of Practice and Procedure of the United States Tax Court, Rule 142(a) (Jan. 1, 1984). A finding regarding a taxpayer's motivation is purely one of fact, and as such may not be disturbed on appeal unless shown to be clearly erroneous. Godfrey, 335 F.2d at 84; White v. Commissioner, 227 F.2d 779, 780 (6th Cir.1955), cert. denied, 351 U.S. 939, 76 S.Ct. 836, 100 L.Ed. 1466 (1956). Based upon the evidence presented at trial, the Tax Court found that the primary purpose of Food Rethermalization's partners for entering into the license transaction with PLI was to realize tax benefits that they hoped would flow from the transaction to the investors in Food Rethermalization. The court stated that "the most that can be said is that they were indifferent to the success of the venture as a business proposition." Because this finding is supported by the record, we hold that the finding was not clearly erroneous.
 
 
 17
 The Tax Court's opinion demonstrates that it relied on the evidence presented to it in finding that the partnership did not possess the requisite profit motive. The record reveals that Flynn testified that he and Nunez relied primarily upon Market Forge's involvement and the market projections Souder prepared. Flynn admitted that neither he nor Nunez ever sought to determine the significance of Market Forge's involvement by seeking its views as to the commercial feasibility of the project or the difficulties that might arise. Neither Flynn nor Nunez questioned Market Forge regarding its projections and neither sought the projections of a disinterested expert. The Tax Court was entitled to find, as it did, that Souder's projections were clearly unreliable, for they were developed to be used to sell the patent rights first to Market Forge, and then to the partnership. Further, as the court noted, Flynn's experience was not sufficient to warrant reliance on it. Flynn's experience was dated and was in the area of operating food service establishments rather than in developing equipment for them. Flynn's consultations with outside experts were also not sufficient to allow him to evaluate the detailed projections. In light of this evidence, the court was free to disagree with appellants that Market Forge's involvement alone was enough to show that appellants entered into the transaction with a profit motive,[5] and to disagree with appellants' claim that Flynn and Nunez had sufficient expertise to evaluate the technology and Souder's projections. The court was warranted in finding that the failure of Flynn and Nunez to make basic inquiries demonstrated that they lacked a profit motive.
 
 
 18
 There was also sufficient evidence in the record to support the Tax Court's finding that Souder's projections of the non-hospital markets were unreliable. Souder had no experience in areas of food service outside the hospital field. Additionally, the court justifiably inferred that because Market Forge was a leader in hospital feeding but had no experience in other areas, making a rapid expansion into those areas would be unlikely. Souder's projections, however, showed the expansion occurring almost immediately.
 
 
 19
 The court also was not clearly erroneous in concluding that even if Souder's projections were correct, the seven-year promissory note given to PLI by Food Rethermalization would not have been paid when the license agreement expired. The court noted:
 
 
 20
 Assuming that only the hospital market was exploited, but that it was exploited as rapidly and successfully as Souder projected that it would be ..., the note would not have been fully paid until 1986, 10 years after the license agreement was signed. Assuming that all markets for which Souder developed projections were exploited, which we consider implausible, the note would not have been fully paid until 1984, 8 years after the license agreement was signed. In each case, ... a substantial sum of money would have been required to pay off the balance due--even larger sums would have been required if only Souder's conservative projections had materialized. Similarly, substantial sums would have been required to extend the license agreement.
 
 
 21
 All of these findings buttress the court's ultimate finding that the transactions were not entered into primarily with a profit motive on the part of the taxpayers.[6]
 
 
 22
 Appellants also argue that the Tax Court improperly relied upon a burden of proof analysis in determining that appellants had not established that they had a profit motive at the time they entered into the transaction. Appellants agree they had the burden of establishing a profit motive. Rules of Practice and Procedure of the United States Tax Court, Rule 142(a) (Jan. 1, 1984). Appellants argue, however, that the Tax Court could only have concluded they did not meet their burden by ignoring all of appellants' testimony about their motives. Appellants fail to recognize that the Tax Court could consider the testimony of appellants' witnesses but reject it. An examination of the Tax Court's opinion reveals that the court did just this. As discussed above, the court's findings were not clearly erroneous, for the record reveals that there was a sufficient basis for these findings.
 
 
 23
 Finally, appellants argue that the Tax Court improperly failed to permit a deduction under section 163 for the interest paid on the partnership's $420,000 recourse note to PLI. 26 U.S.C. Sec. 163. The partnership's returns for 1977 and 1978 indicate, however, that the income generated from the receipt of interest on the limited partners' payments on their installment notes was offset by a corresponding deduction for the partnership's payment of interest on the $420,000 note. An examination of the Notices of Deficiency reveals that the Commissioner took this fact into account and in fact allowed the interest deductions claimed.
 
 
 24
 Accordingly, we AFFIRM the decision of the Tax Court.
 
 
 25
 DAVID A. NELSON, Circuit Judge, dissenting.
 
 
 26
 I do not believe that the Tax Court's decision ought to be affirmed in its present form.
 
 
 27
 The basic question, as the Tax Court saw it, was whether the taxpayers proved that the Food Rethermalization partnership had the requisite profit objective in purchasing its license for the invention patented by Messrs. Souder and Waldorf. A major part of the consideration for the license consisted of the $2.9 million non-recourse seven-year promissory note payable out of the royalties that the partnership hoped to receive from Beatrice Foods Corporation's Market Forge Division. The Tax Court found that the partnership had no reasonable basis for supposing that royalties paid in the first seven years would be sufficient to pay anything close to $2.9 million on the note--and this finding, as I read the Tax Court's opinion, was the real underpinning for the court's conclusion that the transaction lacked economic substance.
 
 
 28
 I have no quarrel with the finding that nothing approaching $2.9 million was likely to be paid on the note during the first seven years. But the patents (the validity of which is not questioned by the Internal Revenue Service) were good for 17 years, and the testimony showed that Beatrice Foods expected to have the exclusive use of the patents for the full 17 years. Beatrice Foods said, indeed, that it would not have gone forward without that understanding. Although the initial term of the partnership's license was only seven years, the partnership had a fixed contractual right to extend the license for an additional ten years on payment of a fee in the amount of only three percent of the royalties received during the original seven-year term. Extension of the license would automatically extend the promissory note for ten years as well.
 
 
 29
 The record, as I shall attempt to show, demonstrates that exercise of the right to extend would have seemed a virtual certainty from the investors' vantage point in 1976. That being so, I believe it was clearly erroneous for the Tax Court to use a seven-year time frame in analyzing the economics of the transaction. Had the Tax Court run the economics over a seventeen-year period, I think the court's conclusion that the transaction lacked economic substance would have been quite different.
 
 
 30
 Before looking at the numbers, it might be well to say something about the invention itself, and the enthusiasm with which it was viewed by Beatrice Foods and others.
 
 
 31
 Hospitals and other institutions that have to feed large numbers of people can save significant amounts of money by operating their kitchens only five days a week, on a nine-to-five schedule, preparing meals that can be kept on ice until needed and then reheated. But the typical institutional meal includes some foods and beverages that ought to be served cold, others that ought to be served warm, and others that ought to be served piping hot--and the mix will vary from meal to meal. The invention that Souder and Waldorf came up with was designed to provide a simple and efficient method of seeing that each individual component of each individual meal receives exactly the right amount of heat just before the meal is served regardless of when the meal may have been prepared originally.
 
 
 32
 The inventors' idea was to have the central kitchen put individual food portions in separate color-coded containers, the bottoms of which, in the case of containers intended to be heated, would be metalized. The filled containers, fitted with insulated covers, would then be placed on serving trays, and the trays would be stacked on the shelves of a refrigerated transport cart. Shortly before mealtime, the flip of an electric switch on the transport cart would activate induction heating coils in each shelf, producing heat-generating currents in those containers made with metallic bases; the other containers would receive no heat at all. The metallic bases could be calibrated, at the time of manufacture, to transmit different amounts of heat--so as long as the kitchen staff put the right food in the right container, each serving tray would come out of the cart with the contents of each dish at just the right temperature.
 
 
 33
 Mr. Souder talked to several large companies that he thought might be interested in acquiring manufacturing rights for his invention, and he testified that he "got significant interest from virtually everybody who saw it." Beatrice Foods was the first to indicate that it "would like to go head-long into developing and implementing this technology," and in March of 1976 that company signed a memorandum of understanding with Souder and Waldorf under which the company took an option on the patent and agreed to finance the construction of a prototype unit with a view to marketing the product. The agreement was to remain in effect for the life of the patent.[1]
 
 
 34
 Gerald Duszynski, Director of New Product Development for Beatrice Foods' Market Forge Division, testified that the technology used in this project was "unquestionably" more advanced than that used in the reheating systems that were then on the market. Mr. Duszynski "really liked the concept," he testified, and he "took it on enthusiastically." Everyone at Market Forge, including the chief engineer, was "very upbeat" about the project. They told the inventors' lawyer, Mr. Schwartz, that they thought this was an "exciting" product. Two years later, when the company decided to terminate its involvement in the project, Marketing Vice-President Henry Coletti wrote Schwartz, Waldorf, et al. that
 
 
 35
 "Market Forge still strongly believes that once developed, this product will revolutionize the health care patient feeding market for years to come. Our marketing projections and market studies all indicate a large viable market eager for a simple, labor-saving product within a wide cost range." Exhibit AA, Coletti letter of June 26, 1978 (emphasis supplied).
 
 
 36
 Mr. Robert Flynn, who helped put together the group that brought out Souder and Waldorf in 1976, testified that his contacts at Cornell University and in the military gave him to understand that this new technology was "far superior" to what was already in the marketplace. Mr. Flynn's expertise was in marketing and food service, not engineering, and he relied on Mr. Waldorf--whom he considered a "brilliant" engineer--to see that the prototype was built correctly. Mr. Waldorf apparently fell down on the job, but there was no showing that he was not up to the task from a technical standpoint.
 
 
 37
 Mr. Flynn was not privy to Market Forge's market projections, to be sure, but he knew of the company's enthusiasm for the product, and he relied totally on Market Forge to handle the marketing; "without them," he testified "we wouldn't have done anything."[2]
 
 
 38
 At least one of the physicians who invested in the partnership testified that Transtherm was "an excellent concept" for both hospitals and nursing homes, as well as for the meals-on-wheels method of feeding home-bound geriatric patients. There was no effective impeachment of this or other testimony that was given along the same lines.
 
 
 39
 After listening to all the testimony, the trial judge told counsel he was satisfied that the people involved in the project were, as the judge put it, "looking for big bucks." What obviously troubled the judge was not whether the taxpayer-investors had a bona fide profit objective with respect to the half million dollars they were committed to paying up front, but whether that objective extended to the $2.9 million non-recourse note as well.[3] The answer to this question turns on the market prospects, as seen from late 1976, over the probable life of the note.
 
 
 40
 The record contains ample evidence on this subject. Market Forge, as the trial judge recognized, was "an independent third party of national standing." As a division of Beatrice Foods, it was hardly a fly-by-night operation. Its assessment of the market potential would obviously merit respect, and the testimony of Messrs. Coletti and Duszynski gives a reasonably clear picture of how Market Forge saw the numbers shaping up.
 
 
 41
 Although Market Forge was more pessimistic than Souder and the investors were with regard to the near term, the sales that Market Forge projected once the product was finally developed were impressive enough. Mr. Coletti testified that it would take four years for "real marketing" to begin and "five years before you start to see any kind of money coming in on it." Mr. Duszynski concurred; he thought that actual sales would not begin before 1980. By 1985, however, Duszynski thought sales would reach a rate of about $13 million a year. Total hospital sales for the five years ending with 1985 were projected to be in the range of $32 million or $33 million, according to Duszynski; Coletti thought that $35 million was a possibility.
 
 
 42
 Mr. Coletti believed, as he wrote in mid-1978 and as he confirmed from the stand, that the new product would "revolutionize the health care patient feeding market for years to come." The growth potential after 1985 was not quantified, but Mr. Coletti insisted that Market Forge had to have exclusive use of the patents for the full 17 years, and there was no indication that he doubted there would be an increase in sales after 1985.
 
 
 43
 Against that background, and assuming, as I think one must, that Market Forge's projections were not unreasonable, I find it inexplicable that the Tax Court should have thought there would be any doubt, as of 1976, about an extension of the license agreement and the non-recourse note in December of 1983, when the primary term of seven years was scheduled to expire. If Market Forge was right that sales would not begin until 1980, total sales through 1983 could hardly be expected to exceed $20 million. On that hypothesis, the total royalty income received through 1983 would be less than $1 million--and the cost of extension (three percent of royalties to date) would be less than $30,000.[4]
 
 
 44
 If the partnership did not pay this modest $30,000 extension charge upon the expiration of the primary term (and if it did not pay off the non-recourse note in full at that time), the patents would revert to Patents Licensing International. That company and its backers, Souder, Waldorf and Schwartz, could then look forward to receiving 100 percent of the royalties generated by the product over the next ten years. Assuming average annual sales of only $13 million, the additional royalties would total $6.5 million. Seventy percent of that $6.5 million could be kept by the partnership, on the other hand, if it simply paid the $30,000 and extended its license and note. If the Market Forge numbers were at all indicative of how a reasonable person would view the market prospects in 1976, therefore, it is inconceivable that the partnership would not have been planning to exercise its right to extend. And the record clearly shows an intent to extend: "The reality of it," Mr. Flynn testified without contradiction, "was we had seventeen years ... [to pay the] $2.9 million, and we thought it was a cakewalk."
 
 
 45
 Assuming an extension, then, we come at last to the question of what the economics for the full 17 years would have looked like in 1976 to an investor with a bona fide profit objective. The Market Forge projections are highly relevant in this connection, for reasons already explained.
 
 
 46
 Under the Market Forge projections, sales to hospitals alone could have been expected to total around $150 million over the life of the patent. Royalties on these sales would be approximately $7.5 million. Thirty percent of that amount--$2.25 million--would have to be paid to Patents Licensing on the non-recourse note, in addition to payments of $500,000 outside that note. And approximately $4.75 million would be left for the taxpayer-investors.
 
 
 47
 The return to the investors would be even larger than $4.75 million, of course, to the extent that Market Forge succeeded in making sales to institutions other than hospitals--and such sales would also generate additional funds for the holder of the non-recourse note. (Whether the note would have been paid in full, with interest, may be somewhat problematical, but I take it that assurance of payment in full would not be essential to a demonstration that the investors had a reasonable profit objective.)
 
 
 48
 The Tax Court found as a fact that Flynn and his partner, whom the court viewed as stand-ins for all the investors, were, at best, "indifferent to the success of the venture as a business proposition." That finding would make sense only if the investors' interest in the patents were limited to seven years. Their interest was not so limited, as we have seen--and the investors could hardly have been "indifferent" to the multi-million dollar returns that seemed to be in the offing over the full 17-year period. The Tax Court's finding to the contrary does the investors a grave injustice, in my opinion, and I consider the finding clearly erroneous.
 
 
 49
 Accordingly, I would remand this case for recalculation of the taxes owed, using a life of 17 years for the license and making a corresponding adjustment in the period over which the cost of the license was to be amortized. (The seven-year amortization period used by the taxpayers was unrealistic, of course, under my view of the case.) My colleagues having seen the matter differently, I respectfully dissent.
 
 
 
 *
 The Honorable Thomas A. Wiseman, Jr., Chief Judge, United States District Court for the Middle District of Tennessee, sitting by designation
 
 
 [1]
 The Tax Court consolidated each of the taxpayer's cases for trial, briefing and opinion. Its memorandum opinion is reported at 57 T.C.M. (P-H), p 88,310 (1988)
 
 
 [2]
 The Tax Court did not, as appellants allege, misapply Dreicer v. Commissioner, 665 F.2d 1292, 1294 (D.C.Cir.1981), which held that "a taxpayer engages in an activity for profit, within the meaning of Section 183 and the implementing regulations, when profit is actually and honestly his objective though the prospect of achieving it may seem dim." Rather, the court found that profit was not actually and honestly Food Rethermalization's objective
 
 
 [3]
 Section references are to the Internal Revenue Code as amended and in effect during the years in issue
 
 
 [4]
 Section 183 of the Internal Revenue Code states:
 In the case of an activity engaged in by an individual ..., if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section.
 26 U.S.C. Sec. 183(a). "In determining whether such a profit motive exists, a court must consider the objective facts and must also look to nine general factors set out in the Treasury Regulations." Campbell v. Commissioner, 868 F.2d 833, 836 (6th Cir.1989). These factors are:
 (1) the manner in which the taxpayer carried on the activity;
 (2) the expertise of the taxpayer or his advisors;
 (3) the time and effort expended by the taxpayer in carrying on the activity;
 (4) the expectation that assets used in the activity may appreciate in value;
 (5) the success of the taxpayer in carrying on other similar or dissimilar activities;
 (6) the taxpayer's history of income or loss with respect to the activity;
 (7) the amount of occasional profits, if any, which are earned;
 (8) the financial status of the taxpayer; and
 (9) whether elements of personal pleasure or recreation are involved.
 Id. at 836 n. 3 (citing Treas. Reg. Sec. 1.183-2(b)).
 
 
 [5]
 Although the dissenting opinion discusses Market Forge's enthusiasm for the project, the record indicates that Market Forge contributed only $25,000 to the development of the product and made no guarantees regarding its continued involvement in the development endeavor. In fact, as noted above, Market Forge ultimately withdrew its support for the project
 
 
 [6]
 The appellee, in its brief, notes other factors apparent from the record that support the Tax Court's finding. Appellee notes that the failure to show that the license agreement had a value anywhere near its $3 million price, coupled with the use of nonrecourse debt to finance the bulk of it, shows lack of a profit motive. Appellee also notes that Flynn and Nunez promoted an investment in the partnership through emphasizing tax benefits and that the partnership's history of consistent losses and its renewal of the license demonstrated the lack of a profit motive. Although these factors further support the Tax Court's conclusion, the factors discussed by the court and set forth above are sufficient for our holding that the court's finding of a lack of profit motive was not clearly erroneous
 
 
 [1]
 Both the original memorandum of understanding and a confirmatory agreement signed early in 1977 gave Beatrice Foods exclusive manufacturing rights extending until the expiration of the patents. Souder and Waldorf were parties to both agreements, and the corporation they formed to hold the patent, Patents Licensing International, was a party to the confirmatory agreement also. The renewal option contained in the license granted to the Food Rethermalization partnership by Patents Licensing provided that the license would be "nonexclusive" during the ten-year renewal period, but as a practical matter this limitation was illusory as long as Beatrice Foods wanted to retain its exclusive rights for the full 17 years
 
 
 [2]
 The Tax Court noted that Mr. Flynn's extensive experience in the institutional feeding area was "dated," and notwithstanding his subsequent success in the financial area, the court questioned Flynn's ability to evaluate Souder's market projections. The venture would have seemed economically viable even with much lower projections, however, and the Tax Court's opinion seems to me to evidence a lack of understanding of how investors actually make decisions and how much technical expertise they typically bring to the task. "I've learned in the years of my life," the judge remarked during trial, "that there are a lot of things that go on in business that I don't understand." Investment analysis may be one of those things; under the Tax Court's view of the world, one suspects, Queen Isabella ought not to have pawned her jewels to finance Christopher Columbus, and Warren Buffet ought not to exist
 
 
 [3]
 The judge may have had a conceptual problem with the idea that any taxpayer should ever be permitted to take deductions in respect of indebtedness for which the taxpayer was not personally at risk. The law permitted such deductions at the time with which we are concerned here, however. Congress changed the law later on, but the change did not apply retroactively to the time period involved in this case
 
 
 [4]
 The cost of extension would be greater than $30,000 under Mr. Souder's more optimistic sales projections, of course, but the profit potential for the remaining ten years would be greater too, under those projections. The incentive to extend would have been even stronger under Souder's scenario than under Market Forge's