T.C. Memo. 1997-417


UNITED STATES TAX COURT


KENNETH E. PERRY AND MARY A. HOFER, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 21336-94.          Filed September 18, 1997.


<u>Bruce W. Powell</u> and <u>Michael H. Gertner</u>, for
petitioners.

<u>John J. Boyle</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

WHALEN, <u>Judge</u>:  Respondent determined the following
deficiencies in and additions to petitioners' joint Federal
income tax for the years in issue:

| | | Additions to Tax | | |
|---|---|---|---|---|
| Year | Deficiency | Sec. 6653(a)(1)(A) | Sec. 6653(a)(1)(B) | Sec. 6653(a)(1) |
| 1986 | $1,575.26 | $78.86 | [1] | -- |
| 1988 | 6,649.00 | -- | -- | $332.45 |

[1] Plus 50 percent of the interest payable under sec. 6601 with respect to the portion of the underpayment which is attributable to negligence.

All section references are to the Internal Revenue Code as in effect during the years in issue. Respondent also determined the following deficiencies in, additions to, and penalty on petitioner Kenneth E. Perry's separate Federal income tax for the years in issue:

| | | Additions to Tax | | Penalty |
|---|---|---|---|---|
| Year | Deficiency | Sec. 6653(a)(1)(A) | Sec. 6653(a)(1)(B) | Sec. 6662 |
| 1987 | $3,920 | $196 | [1] | -- |
| 1989 | 4,020 | -- | -- | $804 |
| 1990 | 825 | -- | -- | 165 |
| 1991 | 1,367 | -- | -- | 273 |

[1] Plus 50 percent of the interest payable under sec. 6601 with respect to the portion of the underpayment which is attributable to negligence.

After concessions, the issues remaining for decision are: (1) Whether petitioners' horse breeding and boarding activity during 1986 and 1988 was an "activity not engaged in for profit" within the meaning of section 183; (2) whether petitioner Kenneth E. Perry's horse breeding and boarding activity during 1987, 1989, 1990, and 1991 was an "activity not engaged in for profit" within the meaning of section 183; (3) whether petitioners are liable for the

additions to tax for negligence prescribed by sections 6653(a)(1)(A) and (B) and 6653(a)(1) with respect to their 1986 and 1988 returns; (4) whether petitioner Kenneth E. Perry is liable for the additions to tax for negligence prescribed by section 6653(a)(1)(A) and (B) with respect to his 1987 return; and (5) whether petitioner Kenneth E. Perry is liable for the accuracy-related penalty prescribed by section 6662 with respect to his 1989, 1990, and 1991 returns.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners are husband and wife who filed joint Federal income tax returns for 1986 and 1988. Petitioner Kenneth E. Perry filed separate Federal income tax returns for 1987, 1989, 1990, and 1991. At the time they filed their petition in this case, petitioners resided in Brookville, Ohio.

Petitioners were both raised on family farms, and both have been around horses most of their lives. Mr. Perry learned to break and care for horses when he was 10 to 12 years old and was involved in purchasing, breeding, training, and selling horses with his father and brother for over 20 years prior to 1986. Ms. Hofer also learned to break and care for horses at a very young age

and was also involved in purchasing, breeding, training, and selling horses for some time prior to the years in issue.

Mr. Perry studied business administration and industrial management at Franklin University, Dayton University, Michigan State University, and San Jose State University. The record does not disclose whether he received a degree from any of these institutions. Mr. Perry began working for the General Motors Corp. sometime in or around the mid-1970's.

Ms. Hofer holds a dual bachelor's degree in production operative management and logistics from Ohio State University. In 1984, she began working as a production supervisor for General Motors. Mr. Perry and Ms. Hofer became acquainted in 1984 through their mutual employment with General Motors and were married sometime prior to 1986. Petitioners subsequently had two children together, Muriel, born December 9, 1987, and Lauren, born October 9, 1989.

Petitioners were both full-time employees of General Motors throughout the years in issue. Petitioners received the following wages from their employment with General Motors during the years in issue:

| Year | Mr. Perry | Ms. Hofer | Total |
|------|-----------|-----------|-------|
| 1986 | $56,140 | $40,608 | $96,748 |
| 1987 | 52,014 | 39,910 | 91,924 |
| 1988 | 52,485 | 43,064 | 95,549 |
| 1989 | 55,167 | 43,358 | 98,525 |
| 1990 | 61,487 | 45,562 | 107,049 |
| 1991 | 56,905 | 48,653 | 105,558 |

Mr. Perry retired from General Motors in 1995. At the time of trial, Ms. Hofer was on dependent care leave and did not wish to return to work.

At the time they were married, petitioners planned to acquire a farm and raise horses. Before implementing this plan, petitioners had at least one conversation with Mr. John Adkins, who had extensive experience breeding Tennessee Walking Horses. Based on their discussions with Mr. Adkins and their prior experience, petitioners decided to acquire and develop a breeding stock of registered Tennessee Walking Horses. Petitioners knew that the undertaking would require a substantial outlay of cash and that there was a significant likelihood of losses during the early stages. However, petitioners did not have a formal business plan or income projection at the time they began the undertaking. Petitioners believed that they could create a self-sustaining breeding operation by acquiring and developing sufficient real estate, planting appropriate crops, and acquiring attractive horses. At the time they began their horse-related operation, petitioners

believed that they could eventually generate a profit of approximately $8,000 to $10,000 per year.

Petitioners began their horse-related operation on June 28, 1986, when they acquired a registered Tennessee Walking Horse stallion from Mr. Adkins.  After purchasing this stallion, petitioners acquired and developed various parcels of real property to facilitate their activity.  In the following discussion, we describe petitioners' real estate transactions before describing their acquisitions and transfers of horses.

Real Estate Transactions

On November 21, 1986, petitioners purchased 1.72 acres of real estate located in Union County, Ohio, for a total price of $103,733.95.  Petitioners satisfied $11,855.24 of the purchase price with cash and executed a promissory note for the balance.  Petitioner obtained a portion of the cash downpayment from a savings account and obtained the remainder by cashing in Mr. Perry's retirement options and Ms. Hofer's stock options with General Motors.  The 1.72-acre parcel included a small house which petitioners used as their personal residence from the time they acquired the property until 1994.  Petitioners constructed a small barn and two separate paddocks on the 1.72-acre parcel.  The barn consisted of two open stalls and a separate area for

storing hay and was completed in early 1987 at a total cost of approximately $13,000.

On or about June 15, 1987, petitioners purchased 4 additional acres of real estate contiguous to the 1.72-acre parcel for a total price of $10,000. The party from whom petitioners purchased this land retained the right to harvest a crop already growing on the property. In 1988, after this crop was harvested, petitioners tilled the soil and converted the land to pasture. Petitioners also constructed a second, larger barn on the 4-acre parcel. This barn consisted of six bay stalls, one wash stall, a tack room, and an "open run-in". The barn was completed in 1989 at a total cost of $30,700.

On or about April 15, 1989, petitioners purchased an additional 19.491 acres of land contiguous to the 4-acre parcel and adjacent to the 1.72-acre parcel for a total price of $48,727.50. Shortly thereafter, petitioners prepared a portion of the land for pasture and the remainder for cultivating alfalfa. Petitioners did not erect any structures on the 19.491-acre parcel.

Between 1986 and 1990, petitioners converted a total of approximately 24 acres of the Union County real estate from tillage to pasture and hay fields. Due to severe drought conditions in 1987 and 1988, the pastures and hay fields were not productive as sources of feed for

petitioners' horses until 1990. These drought conditions also caused an increase in the cost of feed and depressed the market for horses.

In 1994, General Motors transferred Ms. Hofer to its plant in Dayton, Ohio. Because of this transfer, and because Mr. Perry was planning to retire from General Motors in 1995, petitioners decided to relocate their home and horse breeding operation to a location nearer Ms. Hofer's work. On or about June 3, 1994, petitioners purchased 20 acres of real estate located in Montgomery County, Ohio, for a total price of $141,273.14. This included a house which petitioners used as their personal residence from the time of the purchase up to the time of trial, and a "home barn".

After acquiring the Montgomery County property, petitioners began selling their real estate in Union County. On or about July 26, 1994, petitioners sold the 1.72- and 4-acre parcels, together with the house and barns, for a total price of $212,500. In December 1995, petitioners sold 10 of the remaining 19.491 acres for a total price of $35,000. At the time of trial, petitioners were offering the remaining 9.491 acres for sale in three parcels for a total price of $83,000. Petitioners were also continuing to cultivate alfalfa on the remaining Union

County property and intended to plant corn on 15 to 18 acres of their Montgomery County property.

## Horse Acquisitions, Transactions, and Related Facts

Petitioners acquired, bred, boarded, and sold numerous horses during the years in issue. These included Tennessee Walking Horses, thoroughbreds, and one Morgan. To avoid confusion, we discuss each breed separately.

## Tennessee Walking Horses

On June 28, 1986, petitioners purchased a 12-year-old registered Tennessee Walking Horse stallion named Copy's Big Shot S (Big Shot) from Mr. Adkins for $1,500. At the time of purchase, petitioners intended to use Big Shot as a breeding stallion. Although Big Shot suffered from a bronchial condition, petitioners believed that $1,500 was a favorable price given the horse's bloodline and "confirmation". Big Shot sired a total of eight foals for petitioners before his death in 1992.

On October 15, 1987, petitioners purchased a 1-year-old Tennessee Walking Horse mare named Copy's Sugar Plum (Sugar Plum) for $300. At the time of purchase, petitioners intended to use Sugar Plum as a broodmare. Sugar Plum produced a total of five foals for petitioners prior to the time of trial. One of these foals was killed in 1991 after suffering a broken leg. Petitioners sold

Sugar Plum's second foal, a gelding named Copy's Black Prince, for $650 in 1993 after determining that it lacked adequate confirmation.  Also in 1993, petitioners sold another of Sugar Plum's foals, a filly named Copy's Sugar Shot, for $1,000.  At the time of trial, petitioners were using Sugar Plum and two of its offspring, Copy's Allen Rose and Copy's Eyote Anoka, as broodmares.

In 1988, petitioners purchased an unregistered Tennessee Walking Horse mare named Amy for $1,000.  Amy was in foal at the time of petitioners' purchase and subsequently gave birth.  In 1989, after determining that it was not economically feasible to register Amy or the foal, petitioners sold both horses for a total price of $500.

Also in 1988, petitioners purchased a registered Tennessee Walking Horse mare named Damon's Red Lady for $650.  Damon's Red Lady subsequently produced three foals for petitioners.  Petitioners sold the first of these foals, Shot Strutter, for $650 in 1991.  The purchaser thereafter paid petitioners to board Shot Strutter on their property.

Thoroughbreds

Sometime in 1987, petitioners acquired two thorough-bred mares named Spiro Gyro and Queens Dynasty for $500

each.  At the time of purchase, petitioners erroneously believed that both mares were in foal.  Petitioners later learned that neither mare was in foal.  They sold Queens Dynasty for $75 after she became ill.  They bred Spiro Gyro, who produced a foal named Flying Footprint in 1989, and sold Spiro Gyro in 1990 for $500.  In 1991, after determining that breeding thoroughbreds would not be profitable, petitioners sold Flying Footprint for $1,000.  However, petitioners repossessed Flying Footprint after receiving only $150 of the purchase price and resold the horse to a second buyer in 1992 for $1,000.

Morgan

Sometime in 1988, petitioners purchased a registered Morgan mare named Dancer for $300.  Petitioners sold Dancer in early 1989 for $375.  The purchaser thereafter paid petitioners to board Dancer on their property.  The record does not disclose the fee petitioners received for this service.

Petitioners are members of the Tennessee Walking Horse Breeders and Exhibitors Association.  With the exception of veterinary and complicated farrier services, petitioners personally performed all of the tasks attendant to their horse-related activity during the years in issue, including feeding and watering, grooming, inoculations, hoof care,

foaling, and breaking.  Petitioners have never shown any of their horses in competitions and do not ride their horses for recreation.

Petitioners advertised their horse-related operation by placing a sign near a road which runs adjacent to their property.  This sign reads "Tennessee Walking Horses boarded and stud [sic] and for sale".  Petitioners also periodically placed advertisements in local magazines and newspapers when they desired to sell a foal or offer a stallion for stud services.

Income and Losses

Petitioners reported a net loss from their horse-related operation during each of the years in issue, calculated as follows:

| | 1986 | 1987 | 1988 | 1989 | 1990 | 1991 |
|---|---|---|---|---|---|---|
| Income: | | | | | | |
| Sale of horses | -- | -- | $75 | $875 | $250 | $500 |
| Boarding fees | | | -- | -- | 1,200 | 1,000 |
| Sale of alfalfa | -- | -- | -- | -- | 2,599 | -- |
| Sale of hay | -- | -- | -- | -- | -- | 1,700 |
| Sale of tractor | -- | -- | -- | -- | 1,600 | -- |
| Unexplained income | -- | -- | -- | -- | -- | 70 |
| Gross income | -- | -- | 75 | 875 | 5,649 | 3,270 |
| Expenses: | | | | | | |
| Breeding fees | -- | $(500) | -- | (234) | -- | -- |
| Depreciation & sec. 179 expenses | -- | (1,308) | (3,363) | (3,321) | (3,692) | (3,203) |
| Feed purchased | $(1,886) | (5,019) | (7,596) | (3,153) | (880) | (1,083) |
| Fertilizers & lime | -- | -- | -- | -- | -- | (135) |
| Freight & trucking | (50) | -- | -- | -- | -- | -- |
| Gasoline, fuel, oil | (280) | -- | -- | -- | -- | -- |
| Insurance | -- | -- | -- | (250) | (250) | -- |
| Labor hired | -- | -- | (2,300) | -- | -- | (381) |
| Rent of farm, pasture | (990) | -- | -- | (500) | -- | -- |
| Repairs, maintenance | -- | -- | -- | -- | (923) | (589) |
| Seeds, plants purchased | (120) | -- | (200) | (1,681) | -- | -- |

| | 1986 | 1987 | 1988 | 1989 | 1990 | 1991 |
|---|---|---|---|---|---|---|
| Storage, warehousing | -- | (1,200) | -- | -- | -- | -- |
| Supplies purchased | -- | -- | (3,500) | (1,045) | (162) | -- |
| Veterinary fees, medicine | (85) | (1,658) | (1,347) | (504) | -- | (507) |
| Other expenses | -- | (516) | (5,450) | (1,975) | (874) | (550) |
| Total expenses | (3,411) | (10,201) | (23,756) | (12,663) | (6,781) | (6,448) |
| Net income (loss) | (3,411) | (10,201) | (23,681) | (11,788) | (1,132) | (3,178) |

Petitioners reported the losses in 1986 and 1988 on Schedules F attached to their joint income tax returns. Mr. Perry reported the losses in 1987, 1989, 1990, and 1991 on Schedules F attached to his individual income tax returns. We note that Mr. Perry's return reports gross income of $3,270 for 1991, whereas the stipulation of facts filed by the parties states that petitioner received only $3,200 of gross income in that year. The record does not disclose the reason for this discrepancy, and we accept the figure stated in petitioner's return. The additional $70 which is not explained in the stipulation is listed as "unexplained income" in the above schedule. Mr. Perry reported net losses from his horse breeding and boarding activity in 1992 and 1993 of $1,720 and $517, respectively, and a net profit of $1,274 in 1994.

Respondent began the examination of petitioners' tax returns sometime in or around 1988. On December 19, 1989, petitioners filed with respondent Form 5213, Election to Postpone Determination as to Whether the Presumption That an Activity is Engaged in for Profit Applies, for an

activity described as "Breeding and showing horses" beginning with the 1986 tax year.

## Books and Records

Initially, petitioners' financial record keeping consisted of retaining receipts of expenses related to the horse activity in a box in their home. At the end of the year, petitioners would sort through these receipts with an accountant to calculate their tax liability. In or around 1988, after the start of respondent's audit, petitioners began recording receipts and expenditures related to their horse operation on a calendar where they also recorded important events such as the dates foals were born and the dates of inoculations. In or around 1989, petitioners also began transferring these records to financial ledgers. Petitioners did not maintain a separate bank account for their horserelated activity during any of the years in issue and did not introduce any of their financial records into evidence.

OPINION

## Section 183

The primary factual issue in this case is whether petitioners' horse breeding and boarding operation was an "activity not engaged in for profit" as defined by section 183. Section 183(a) provides generally that in the case of

an individual or an S corporation no deduction attributable to an activity which is not engaged for profit is allowed except as provided in section 183(b).  Section 183(b)(1) allows the deductions which would be allowable without regard to whether the activity is engaged in for profit. Section 183(b)(2) allows a deduction equal to the amount of the deductions that would be allowable for the taxable year if the activity were engaged in for profit, but only to the extent the gross income derived from the activity exceeds the deductions allowable under section 183(b)(1).

Section 183(c) defines "activity not engaged in for profit" as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." The test for determining whether an activity is engaged in for profit is whether the individual is engaged in the activity with "the actual and honest objective of making a profit".  See Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without published opinion 702 F.2d 1205 (D.C. Cir. 1983); Brannen v. Commissioner, 78 T.C. 471, 502 (1982), affd. 722 F.2d 695 (11th Cir. 1984); Allen v. Commissioner, 72 T.C. 28, 33 (1979).  Although a taxpayer need not have a reasonable expectation of earning a profit, he must have entered into or continued the activity with a bona fide objective of doing so.  See Keanini v. Commis-

sioner, 94 T.C. 41, 46 (1990); Hulter v. Commissioner, 91 T.C. 371, 393 (1988); Beck v. Commissioner, 85 T.C. 557, 569 (1985); Dreicer v. Commissioner, supra; Golanty v. Commissioner, 72 T.C. 411, 425-426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); sec. 1.183-2(a), Income Tax Regs.  "Profit" in this context means economic profit, independent of tax savings.  See Hayden v. Commissioner, 889 F.2d 1548, 1552 (6th Cir. 1989), affg. T.C. Memo. 1988-310; Antonides v. Commissioner, 91 T.C. 686, 694 (1988), affd. 893 F.2d 656 (4th Cir. 1990); Landry v. Commissioner, 86 T.C. 1284, 1303 (1986).

Whether a taxpayer engages in an activity with the requisite profit motive is a question of fact to be resolved on a consideration of all the facts and circumstances in the record.  See Lemmen v. Commissioner, 77 T.C. 1326, 1340 (1981); Allen v. Commissioner, supra; sec. 1.183-2(b), Income Tax Regs.  Petitioners bear the burden of proving that they engaged in the subject activity with the requisite profit motive, and greater weight is given to objective facts than to petitioners' mere statement of intent.  See Rule 142(a); Siegel v. Commissioner, 78 T.C. 659, 699 (1982); Churchman v. Commissioner, 68 T.C. 696, 701 (1977); sec. 1.183-2(a), Income Tax Regs.  All Rule references are to the Tax Court Rules of Practice and Procedure.

Single Activity

Before determining whether, and to what extent, section 183 and the regulations thereunder apply, the activity or activities of the taxpayer must be ascertained. Sec. 1.183-1(d)(1), Income Tax Regs. In making this determination, the general rule is that we must take all the facts and circumstances of the case into account. Id. The regulations provide as follows:

> In ascertaining the activity or activities of the taxpayer, all the facts and circumstances of the case must be taken into account. Generally, the most significant facts and circumstances in making this determination are the degree of organizational and economic interrelationship of various undertakings, the business purpose which is (or might be) served by carrying on the various undertakings separately or together in a trade or business or in an investment setting, and the similarity of various under- takings. Generally, the Commissioner will accept the characterization by the taxpayer of several undertakings either as a single activity or as separate activities. The taxpayer's characteri- zation will not be accepted, however, when it appears that his characterization is artificial and cannot be reasonably supported under the facts and circumstances of the case. [Id.]

Petitioners characterize all of the undertakings relating to their horse breeding and boarding, including holding the land on which those undertakings were conducted, as a single activity for section 183 purposes. Respondent, on the other hand, contends that petitioners'

holding the land for its appreciation in value should be treated as a separate activity. Respondent maintains that any appreciation in the value of the Union County property "is clearly not the result of, or even related to, the horse-related activity." Respondent also takes the position that this appreciation was not attributable to petitioners' horse breeding and boarding. Respondent argues that any appreciation in the value of the land should therefore not be considered in determining whether petitioners engaged in horse breeding and boarding with the requisite profit motive.

Section 1.183-1(d)(1), Income Tax Regs., provides the following guidance for determining whether "farming" and the holding of the farm land will be considered a single activity:

> Where land is purchased or held primarily with the intent to profit from increase in its value, and the taxpayer also engages in farming on such land, the farming and the holding of the land will ordinarily be considered a single activity only if the farming activity reduces the net cost of carrying the land for its appreciation in value. Thus, the farming and holding of the land will be considered a single activity only if the income derived from farming exceeds the deductions attributable to the farming activity which are not directly attributable to the holding of the land (that is, deductions other than those directly attributable to the holding of the land such as interest on a mortgage secured by the land, annual property taxes attributable to the land and improvements, and depreciation of improvements to the land).

Under its terms, the above rule applies only where "land is purchased or held primarily with the intent to profit from increase in its value". See Engdahl v. Commissioner, 72 T.C. 659, 668 n.4 (1979); Eldridge v. Commissioner, T.C. Memo. 1995-384; Hoyle v. Commissioner, T.C. Memo. 1994-592; Harston v. Commissioner, T.C. Memo. 1990-538, affd. without published opinion 936 F.2d 570 (5th Cir. 1991); Fields v. Commissioner, T.C. Memo. 1981-550; sec. 1.183-1(d)(1), Income Tax Regs. "If the taxpayer's primary intent is not to profit from appreciation of the land, then the general rule of the regulation applies in determining whether there is a single activity." Hoyle v. Commissioner, supra. Under the general rule, all facts and circumstances are taken into account in determining whether several undertakings constitute one activity for purposes of section 183.

In this case, we find that petitioners' primary intent was not to profit from the increase in the value of the land used to conduct their horse breeding and boarding. Rather, petitioners' primary intent was to breed and board horses. Cf. Fields v. Commissioner, supra. In determining whether petitioners' horse breeding and boarding and their holding of the land constitute a single activity, we apply the general rule contained in section 1.183-1(d)(1), Income

Tax Regs., and take all facts and circumstances into account.  See <u>Hoyle v. Commissioner</u>, <u>supra</u>.

We find petitioners' characterization of their horse breeding and boarding, and holding of the land as a single activity to be fully supported by the facts of this case. See generally <u>Keanini v. Commissioner</u>, <u>supra</u> at 46. Petitioners purchased the subject land in Union County, Ohio, for the purpose of breeding and boarding horses thereon.  They considered the cost of the land as part of the cost of the horse breeding and boarding undertakings. Petitioners constructed horse barns on the land, and converted the use of the land to pasture, alfalfa, and hay fields for the purpose of grazing and feeding their horses. Thus, a close organizational and economic relationship exists between the breeding and boarding operation and the holding of the land for appreciation in value.  Cf. <u>id.</u>; sec. 1.183-1(d)(1), Income Tax Regs.

<u>Factors Relating to the Horse Breeding and Boarding Activity</u>

Section 1.183-2(b), Income Tax Regs., lists the following factors relevant to determining whether an activity is engaged in for profit:  (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the

activity; (4) expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on similar or dissimilar activies; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation involved. See also Smith v. Commissioner, 937 F.2d 1089, 1093 (6th Cir. 1991), revg. 91 T.C. 733 (1988). These factors are not exclusive, and no single factor or number of factors is conclusive in determining whether an activity is engaged in for profit. See Dreicer v. Commissioner, 78 T.C. at 645; Vandeyacht v. Commissioner, T.C. Memo. 1994-148; sec. 1.183-2(b), Income Tax Regs.

1. Manner in Which the Taxpayer Carried On the Activity

Petitioners did not have a formal business plan or income projection prior to the time they began their horse breeding and boarding operation. Petitioners also did not introduce any of their financial books or records into evidence. Petitioners testified that during the initial stages of their operation, they simply retained receipts and invoices arising from the activity in a box, which they sorted with their accountant at the end of the year to calculate their income tax liability. Both petitioners

also testified that in or around 1988, they began recording receipts and expenditures related to the horse activity on a calendar, and that they later began transferring these records to a financial ledger. Petitioners further testified that they maintained meticulous records of events relating to their horses, such as births and inoculations, throughout the years in issue. We find petitioners' testimony credible in this regard.

We note that petitioners stopped purchasing thoroughbreds when they determined that they could not profit from that undertaking. Petitioners also placed advertisements in local newspapers and magazines when they desired to sell a horse or offer a stallion for stud services.

2. Expertise of the Taxpayer or His Advisors

Petitioners were both raised on family farms, and both had extensive experience in purchasing, breeding, training, and selling horses. Petitioners also sought and followed the advice of Mr. Adkins, an experienced breeder of Tennessee Walking Horses, prior to the time they began their horse breeding and boarding activity. Moreover, petitioners learned to inoculate their horses and perform other basic health care procedures themselves. Petitioners also joined the Tennessee Walking Horse Breeders Association and educated themselves on bloodlines and markets for

Tennessee Walking Horses. Petitioners appeared at trial to be generally knowledgeable about purchasing, breeding, training, caring for, and selling horses. In light of all this, we find that petitioners did have sufficient expertise to indicate that they engaged in their horse breeding and boarding activity with an actual and honest objective of making a profit.

### 3. Time and Effort Expended by the Taxpayer

While petitioners were both full-time employees of General Motors during the years in issue, petitioners lived on the property where they pursued their horse breeding and boarding activity, and they performed all of the work necessary for the activity themselves, with the exception of veterinary and complicated farrier services.

### 4. Expectation That Assets Used in the Activity Will Appreciate in Value

Section 1.183-2(b)(4), Income Tax Regs., provides in pertinent part as follows:

> The term "profit" encompasses appreciation in the value of assets, such as land, used in the activity. Thus, the taxpayer may intend to derive a profit from the operation of the activity, and may also intend that, even if no profit from current operations is derived, an overall profit will result when appreciation in the value of land used in the activity is realized since income from the activity together with the appreciation of land will exceed expenses of operation.

In this case, we note that petitioners realized an economic gain of approximately $65,000 when they sold their Union County property in 1994, computed as follows:

Sale Price

| | | |
|---|---|---|
| 5.72-acre parcel with barns | $212,500 | |
| 10-acre parcel | 35,000 | |
| Total price | | $247,500 |

Purchase Price

| | | |
|---|---|---|
| 1.72-acre parcel | (103,734) | |
| Small barn | (13,000) | |
| 4-acre parcel | (10,000) | |
| Large barn | (30,700) | |
| 10-acre parcel | [1] (25,000) | |
| Total price | | (182,434) |
| Total economic gain | | 65,066 |

[1]For purposes of this calculation, we accept petitioners' allocation of approximately one-half of the total $48,727.50 paid for the 19.491-acre parcel to the 10-acre portion sold in 1994.

We also note that at the time of trial, petitioners were offering for sale at a total price of $83,000 the remaining 9.491 acres of Union County property, in which they had an unadjusted cost basis of $23,727.50.

The economic gain petitioners realized on the sale of the Union County property in 1994 more than offsets the total $53,391 in operating losses they claimed during the

years in issue.  Thus, appreciation in the value of the land used in the activity helps to explain petitioners' willingness to continue their horse breeding and boarding operation despite the operating losses sustained during the years in issue.  Cf. Allen v. Commissioner, 72 T.C. at 36.  This is strong evidence that petitioners conducted that activity with an honest and actual objective of making a profit.  See, e.g., id.; Fields v. Commissioner, T.C. Memo. 1981-550; Sanderson v. Commissioner, T.C. Memo. 1964-284.

5.  Success in Similar or Dissimilar Activities

Petitioners both testified that they had been involved in purchasing, breeding, training, and selling horses in the past.  While there is no evidence in the record to substantiate their success in these activities, we find their testimony to be credible.  There is no evidence that Mr. Perry or Ms. Hofer was successful in any dissimilar investment or business activities.

6.  History of Income or Losses

Petitioners reported a net loss from their horse activity during each of the years in issue.  We also note that petitioners suffered 2 years of extreme drought, during which they were unable to produce their own feed, the market price of feed increased, and the market for horses decreased.  Cf. Fields v. Commissioner, supra.  We

also note that petitioners made various attempts to improve the profitability of their horse-related activity, such as converting land to pasture and alfalfa, constructing fences and barns, and attempting to acquire and acquiring mares in foal. Petitioners also withdrew from the thoroughbred business when it proved unprofitable and focused their attention on breeding Tennessee Walking Horses.

7. Amount of Occasional Profits

Petitioners did not report a net profit during any of the years in issue. However, petitioners did report a net profit of $1,274 in 1994 and testified at trial that they expected to realize a profit of $8,000 to $10,000 per year once they established a viable stock of Tennessee Walking Horses for breeding. We also note that petitioners' losses decreased gradually between 1991 and 1995, and that they realized substantial gains from the sale of the Union County property in 1994.

8. Financial Status of the Taxpayer

Although petitioners were both full-time employees of General Motors throughout the years in issue, neither of them earned particularly high wages during any of those years. Petitioners also testified that they were forced to cash in their stock options and retirement options with General Motors to finance the purchase of the Union County

property.  Moreover, petitioners had two minor children during each of the years in issue.  We find that petitioners did not have substantial income or capital from sources other than their horse breeding and boarding activity during the years in issue.

9.  Elements of Personal Pleasure or Recreation

Petitioners argue that they did not derive significant personal pleasure or recreational benefits from their horse breeding and boarding operation.  Petitioners point out that their entire experience with horses was purely commercial, and that they did not participate in any horse shows during the years in issue.  Petitioners also point out that Big Shot had a bronchial condition which caused him to be too dangerous to ride.  Moreover, petitioners fed their horses alfalfa, which they contend made the horses unfit for riding, and did not shoe any of their horses.  We find petitioners' testimony credible in this regard and find that they did not ride their horses for pleasure or recreation. However, petitioners both clearly enjoyed working with horses and certainly derived some personal enjoyment from their horse breeding and boarding activity.

Upon consideration of all the facts and circumstances of this case, we conclude that petitioners engaged in their horse breeding and boarding activity with an honest and

actual objective of making a profit. We therefore overrule respondent's adjustments to petitioners' and Mr. Perry's tax for the years in issue.

We note that on the basis of the section 183 adjustments to petitioners' returns, respondent also disallowed the casualty and theft loss deductions claimed by petitioners in 1986 and by Mr. Perry in 1987 because the section 183 adjustments increased petitioners' and Mr. Perry's adjusted gross income in those years and had the effect of decreasing the amount of the casualty losses that could be claimed. See sec. 165(c)(3), (h)(2). Respondent does not dispute that petitioners suffered the casualty losses claimed in 1986 and 1987. Therefore, by reason of the fact that we have not sustained respondent as to the section 183 adjustments discussed above, there is no basis to adjust the casualty and theft losses claimed by petitioners.

<u>Additions to Tax and Penalty</u>

Respondent determined that petitioners are liable for the additions to tax for negligence prescribed by sections 6653(a)(1)(A) and (B) and 6653(a)(1) with respect to their 1986 and 1988 returns, and that Mr. Perry is liable for the additions to tax for negligence prescribed by section 6653(a)(1)(A) and (B) with respect to his 1987 return.

Respondent also determined that Mr. Perry is liable for the accuracy-related penalty prescribed by section 6662 with respect to his 1989, 1990, and 1991 returns.  Because we have not sustained respondent's determination of tax deficiencies in petitioners' or Mr. Perry's income tax for the years in issue, there is no basis for the imposition of the additions to tax and penalties determined by respondent in the notice of deficiency.

In light of the foregoing,

<u>Decision will be entered for petitioners</u>.